LEVI v. EVANS. SAME v. SIEBERLING. SAME v. WILD.

(Circuit Court of Appeals, Seventh Circuit. October 2, 1893.)

Nos. 45-47.

1. EQUITY JURISDICTION—WAIVER.
   Where a defendant in a suit in equity voluntarily enters his appearance therein, expressly waiving the question of the jurisdiction of the court, he cannot afterwards object that the court is without jurisdiction because of the existence of an adequate remedy at law, especially when such objection is not made until after answer filed.

2. SAME—TRUSTS.
   A court of equity has jurisdiction of a suit to establish and enforce an alleged trust, secure an accounting for a fraudulent breach thereof, and settle conflicting claims to a fund in the registry of the court.

3. TRUSTS—EVIDENCE—STOCK SUBSCRIPTION.
   Where one who subscribed for corporate stock in his own name testifies that he subscribed solely for himself, a trust in part of the stock for another, who paid no part of the subscription price, cannot be established by vague and indefinite oral declarations of the subscriber.

4. SAME—RIGHTS OF TRUSTEE—CORPORATE STOCK.
   Three stockholders executed an instrument whereby they professed to sell their stock to the fourth stockholder in the same corporation, "for and during the period of 6 months, in trust for the use and benefit of the grantors," with power to sell the same on certain specified terms. *Held*, that said instrument in no way prevented the latter from selling his own stock on such terms as he chose, it not appearing that his so doing in any way prevented the sale of the stock named in said instrument.

5. SAME—FRAUD BY TRUSTEE—ACCOUNTING.
   A stockholder who sells his own stock, together with stock held by him in trust for another, to a purchaser, who, as an inducement to the sale, buys from him without inquiry a worthless patent right, must account to such other stockholder for a share in the price received for such patent right, proportioned to the amount of the latter's stock.

Appeal from the Circuit Court of the United States for the District of Indiana.

Statement by BAKER, District Judge:

The appellee James L. Evans commenced an action in attachment in the circuit court of Hamilton county, Ind., against the appellant, Emil S. Levi,

making the American Strawboard Company and Crawford Fairbanks garnishee defendants therein. The complaint was in a single paragraph for money had and received, as the proceeds of the sale of certain shares of stock. In the state court the appellee Leonard Wild filed under said attachment a similar complaint. Upon the appellant's petition, the causes were removed into the circuit court of the United States for the district of Indiana. After such removal, and before the filing of the transcript in the federal court, the appellee Monroe Sieberling filed in the latter court his complaint and proceedings in attachment similar to the complaints filed in the state court by Evans and Wild. The transcript on removal was filed on the 9th day of December, 1889. On the 7th day of January, 1890, Crawford Fairbanks, garnishee, acknowledged his indebtedness in the sum of $12,590.80, which he then paid into the registry of the court in obedience to its order. At the same time the American Strawboard Company, garnishee, acknowledged an indebtedness of $24,214.60, which was paid in under the order of the court "for the use of the parties lawfully entitled thereto."

On the 10th day of January, 1890, the following entry was made in the original cause:

"Evans v. Levi. Come James L. Evans, Leonard Wild, and Monroe Sieberling, by Shirts & Vestal and A. C. Harris, their attorneys, and file amended complaints herein as follows: [h. i.] And it is ordered for the convenience of trial that each case be docketed as a separate case, and, on motion, the defendants are ruled to answer such complaint."

The amended complaints so filed were in fact bills in equity, wherein the appellant, Levi, and the American Strawboard Company and Crawford Fairbanks were defendants, charging that conflicting claims to said funds existed, and setting out the facts in detail substantially as stated in the second paragraphs filed May 5, 1890, except that in the latter paragraphs it was shown that all of the money had been paid into court for the use of whoever was entitled thereto.

After the money had been paid into court by Fairbanks and the strawboard company, the appellant, Levi, sought to give the ordinary delivery bond and take the money, but the appellees objected, on the ground that the money was a trust fund, the proceeds of the sale of their stock, and therefore could not be taken out. Thereupon, on the 21st day of January, 1890, the parties entered into the following stipulation:

"Whereas, there is a controversy over the question whether Emil S. Levi has a right to tender a bond and take part or all of the money now in the registry of the circuit court of the United States for the district of Indiana, paid in by the garnishees in cause No. 8,551; and the jurisdiction of the court over the person of the defendant in said cause is also in question: Now, then, in consideration of the mutual settlement of these two questions, it is agreed by and between Emil S. Levi, on the one part, and James L. Evans, Leonard Wild, and Monroe Sieberling, on the other part, that an order shall be forthwith made by said court that the said sums of money shall be forthwith paid over to said Levi or his attorneys, when the said Levi shall file with said clerk an appropriate delivery bond, with R. T. McDonald as surety, and upon the entering by counsel of a full general appearance to said action, and to the amended pleadings filed therein, which have been for the convenience of this court docketed as separate actions, numbered 8,558, 8,559, and 8,560, on the law side of said court. It is understood that by this agreement the said Emil S. Levi expressly waives all questions of the jurisdiction of the Hamilton circuit court or of this court in said causes, including said amended pleadings; but he reserves the right to answer, plead, or demur to the same extent as though he was brought in by process duly served. This agreement may be filed in said cause as evidence of the facts herein set out."

The foregoing stipulation was duly signed, and on the 22d day of January, 1890, the parties filed the same in said causes in said court, and Levi tendered the bond and received the money thereunder. Afterwards, on May 5, 1890, Evans, Wild, and Sieberling each filed second paragraphs of complaint, which differed from the amended bills filed January 10, 1890, only in

that the second paragraphs each showed the money had been paid into court, leaving the litigation to be waged only between the parties to these appeals.

On the 29th of August, 1890, the court made the following order:

"Come the parties, and it appearing that this suit when removed from the state court was an action at law, and it further appearing that after its removal the original plaintiffs filed additional or amended pleadings seeking equitable relief, and that thereupon the defendants entered their appearance to the suit, including said additional or amended pleadings, it is therefore ordered that said common-law action, as it originally stood at the time of removal, be docketed on the law side of the court, and that the additional or amended pleadings be docketed on the equity side thereof, and that they proceed as suits in equity, and the defendants are ordered to answer therein on or before the first Monday in October."

The causes were so docketed, and on the 1st day of October, 1890, the appellant demurred to each bill of complaint, which demurrers were overruled February 17, 1891, and on March 3, 1891, he filed his answers. The causes were put at issue, and were referred to the master, who, by consent, heard the cases together, and on the 12th of October, 1891, made his report finding for the appellees. The appellant filed exceptions to the master's report, pending which he also moved to dismiss the causes. The motion to dismiss, as well as the exceptions, were severally overruled, and final decree was entered in accordance with the master's finding.

The case made by the findings is substantially **as follows:** In 1888, the Noblesville Manufacturing Company was organized with an authorized capital stock of $150,000, of which $80,000 was deemed to be represented and paid up by various donations. The remaining $70,000 was held as follows: Emil S. Levi, individually, $20,000; Levi, trustee for Sieberling, $10,000; James L. Evans, $10,000; Leonard Wild, $10,000; John B. Carter, $10,000; Charles A. Jay, $10,000. By the original agreement, Levi, Evans, Wild, Carter, and Jay were to and did each subscribe for $2,000 for the benefit of Sieberling, in trust, which was to be carried for him in consideration of his knowledge and skill in the business, and in consideration that he should furnish plans for the buildings and machinery. This arrangement was modified by a subsequent written contract, whereby Levi became sole trustee for Sieberling for the $10,000 worth of stock which he was to pay for and hold for his reimbursement, with full power to vote the same. Afterwards, the capacity of the mill was increased, and $80,000 of additional stock was issued, of which $40,000 was sold to one Sheldon, trustee, for A. L. Conger. Sieberling obtained from Conger $10,000 of this stock. The remaining $40,000 was to be divided between the original stockholders in proportion to their holdings of original stock. Levi went to Europe about the time the stock was increased, but left Carter to act for him. Levi, when in Europe, subscribed for $20,000 of the new stock, and sent the subscription paper back to Carter for the other subscriptions. It is claimed that $5,000 of the $20,000 subscription made by Levi was agreed by him to be held in trust for Sieberling, for whom he was to pay assessments as made with his own money. On August 15, 1889, Carter, Evans, and Wild executed the following agreement:

"Know all men by these presents, that we, John B. Carter, of the county of Howard, James L. Evans and Leonard Wild, of the county of Hamilton, all in the state of Indiana, witnesseth, that whereas, the said parties are each the owner of stock in the Noblesville Manufacturing Company, a corporation having its place of business at the city of Noblesville, in said county of Hamilton, of the face value of fifteen thousand dollars: Now, therefore, the said John B. Carter, James L. Evans, and Leonard Wild, for value received, do by these presents bargain, sell, and convey unto Emil S. Levi, of the city and state of New York, for and during the period of six months from this date, all and singular the said shares of stock, and all of our respective interests in said corporation, in trust, however, for the use and benefit of the grantors, and with full and absolute power to the said Levi to sell, transfer and convey the same for cash: provided, however, the said Levi only has power to sell the said shares as a whole, and for not less than the amounts

of money that have been paid thereon by said shareholders to the present time, and one hundred per cent. thereon in addition thereto, together with the amount of money that may be paid upon said shares by the grantors between this date and the date of any sale thereof by said Levi. The proceeds arising from any such sale shall be paid to the grantor in equal shares, by either paying the same to him at said city of Noblesville, or by depositing the same to his credit at the Citizens' State Bank at said city of Noblesville. And the said trustee has full power to do any and all acts necessary to consummate any such sale. And whatever the said trustee may lawfully do in the premises we do hereby ratify, confirm, and grant as if present and doing the same."

This instrument was accepted by Levi, and held and retained by him until after the sale hereinafter mentioned.

A day or two thereafter, Sieberling executed to Levi a similar agreement concerning his stock.

While Levi was holding these instruments, on the 16th of September, 1889, he went to Terre Haute, Ind., in company with John B. Carter, and they then and there sold the stock owned by them in the Noblesville Manufacturing Company to the American Strawboard Company. Crawford Fairbanks represented said strawboard company in said transaction. Levi and Carter together owned 1,267 shares of stock, of the par value of $63,350 on which they had paid subscriptions to the amount of one-half its par value. The strawboard company agreed to pay for said shares of stock $63,350, as follows: $10,000 cash in hand; $10,000 in ten days; and the remainder in three equal installments, in 30, 60, and 90 days; and to assume the payment of the remaining one-half of the unpaid subscription price of said shares of stock. Levi and Carter also agreed not to go into the business of manufacturing strawboard for the period of 20 years. The strawboard company further agreed to buy at the same rate, and upon the same terms and conditions, the interests of Evans, Wild, and Comstock in the Noblesville Manufacturing Company, not exceeding in all $35,000, which was the exact par value of the shares of stock owned by Evans, Wild, and Comstock. At the time of the execution of the foregoing contract for sale of stock, an agreement was entered into between Levi and Carter, of the one part, and Crawford Fairbanks, of the other part, by the terms of which Levi and Carter sold a one-half interest in a patent for grinding wood pulp to Fairbanks for $16,000, said $16,000 to be paid in 60 days. The interest of Carter in said $16,000 was agreed to be $3,409.20, and the interest of Levi therein was agreed to be $12,590.80.

At the date of the contract the patent was worthless. Fairbanks knew nothing about it, nor the principle upon which it operated, and stated that it was not worth anything, and that the money he paid for it was to secure the stock, and that the money paid therefor belonged to the strawboard company.

Upon the execution of the two foregoing contracts, Levi went to Noblesville, and exhibited to Evans and Wild the contract for sale of the stock, and represented that he had a hard time to get it, and he concealed the fact of the existence of the contract for the sale of the patent.

W. A. Ketcham and Louis Newberger, (Morris, Newberger & Curtis, on the brief,) for appellant.

Geo. Shirts and Addison C. Harris, for appellees.

Before WOODS and JENKINS, Circuit Judges, and BAKER, District Judge.

BAKER, District Judge, (after making the foregoing statement.) It is contended by counsel for the appellant that the court erred in overruling his motion to dismiss these causes on the ground that the appellees had a plain and adequate remedy at law. When these causes came from the state court they were actions at law,

upon the common counts, for money had and received. Additional and amended pleadings were filed in the court below, without objection, stating facts which disclosed causes of action of equitable cognizance; and so that court made an order that the original causes should remain on the law side, and the additional and amended pleadings, which disclosed equitable causes of action, should go on the chancery side, and proceed as suits in equity. The court below had the undoubted authority to make such an order. Falls of Neuse Manuf'g Co. v. Georgia Home Ins. Co., 26 Fed. Rep. 1. If additional and amended pleadings, exhibiting causes of action of an equitable nature, could not properly be filed in an action at law, all objection to such course of procedure was expressly waived by the appellant, and he voluntarily appeared to these equitable suits, pursuant to a stipulation entered into by him with the appellees for a valuable consideration. Good faith and fair dealing would now preclude the appellant from profiting by his objection. But, if there had been no waiver, the objection came too late. If a defendant in a suit in equity answers and submits to the jurisdiction of the court, it is too late for him to object that the plaintiff has a plain and adequate remedy at law. 1 Daniell, Ch. Pr. (4th Amer. Ed.) p. 555; Reynes v. Dumont, 130 U. S. 395, 9 Sup. Ct. Rep. 486; New Orleans v. Morris, 105 U. S. 600. Good faith and an early assertion of rights are as essential on the part of the defendant as of the complainant. Brown v. Iron Co., 134 U. S. 530, 10 Sup. Ct. Rep. 604.

These bills, however, are clearly of an equitable character. They seek relief from fraud, and to settle conflicting claims to a fund in the registry of the court, and to establish and enforce an alleged trust, and to secure an accounting for a breach thereof. All of these are familiar subjects of equitable jurisdiction. Story, Eq. Jur. § 601; Fowle v. Laurason, 5 Pet. 495; New Orleans v. Morris, 105 U. S. 600. In 1888 the Noblesville Manufacturing Company was organized with an authorized capital stock of $150,000, of which $80,000 was deemed to be represented and paid up by various donations. The remaining $70,000 was subscribed for by the following persons and in the following amounts: Emil S. Levi, individually, $20,000; Levi, trustee for Monroe Sieberling, $10,000; James L. Evans, $10,000; Leonard Wild, $10,000; John B. Carter, $10,000; Charles A. Jay, $10,000. In March, 1889, at a meeting of the stockholders, the capital stock was increased to $300,000. The ostensible object of this increase was to enable the company to enlarge the capacity of the mill. Eighty thousand dollars of this stock was subscribed for as follows: C. E. Sheldon, trustee, $40,000; Emil S. Levi, $20,000; John B. Carter, $5,000; James L. Evans, $5,000; Leonard Wild, $5,000; Charles A. Jay, $5,000. The master found and reported, and the court below adjudged, that it was a part of the agreement, at the time the last subscriptions were made, that Sieberling was to have $5,000, the same amount of new stock that was allotted to Carter, Evans, Wild, and Jay, and that the $20,000 subscribed in the

name of Levi embraced $5,000 for Sieberling and $15,000 for Levi. This is denied by Levi, who was in Europe at the time he made his subscription, and he insists that he made it wholly on his own account.

It is contended by the appellant that the court below erred in decreeing that $5,000 of the $20,000 subscription made by him in his individual name was actually taken for and on behalf of Sieberling. A careful examination of the evidence satisfies us that this claim is well founded. Levi made the subscription in Europe whereby he took $20,000 of the new stock in his own name, which he agreed to pay for. The contract of subscription was wholly between him and the manufacturing company. The entire right and interest in the stock, as shown by the written contract of subscription, was in Levi. He testified positively and emphatically that such was the fact. The evidence to raise a trust in this stock in favor of Sieberling consists wholly of oral declarations and statements claimed to have been made by Levi and by Carter as his agent. Many of the declarations claimed to have been made by Carter are purely hearsay. The legitimate evidence before the court, we think, fails to show any definite agreement by Levi to subscribe for $5,000 worth of stock for Sieberling. It would violate the soundest principles to permit a trust in favor of Sieberling to be ingrafted on the subscription contract on the loose, vague, and indefinite declarations and statements disclosed in this record. It is not important to discuss the evidence in detail, for if it were conceded to be sufficient to prove that Levi had agreed to subscribe in his name for stock for Sieberling, and to pay the assessments thereon with his own money, and to permit Sieberling thereafter to repay the advances so made, it would not yield any support to the decree. The most that can be claimed is that Levi, before the subscription was made, agreed to subscribe in his own name for $20,000 of stock, and to pay the assessments thereon with his own money, and that $5,000 of it should belong to Sieberling, who should thereafter reimburse Levi for the advances made by him. A trust in respect to money or other personal property may arise or be created by a parol agreement, if founded on a sufficient consideration. Loose, vague, and indefinite expressions are insufficient to create such a trust. The intention must be evinced with clearness and certainty. Perry, Trusts, § 86; Day v. Roth, 18 N. Y. 448; Hon v. Hon, 70 Ind. 135; Mohn v. Mohn, 112 Ind. 285, 13 N. E. Rep. 859. A trust may arise or be created with reference to personal property upon the same facts and circumstances which would give rise to a trust in real estate, except that in respect to the latter the trust must be manifested by an agreement or memorandum in writing, while in respect to the former it may rest in parol. Hunt v. Elliott, 80 Ind. 245. A trust results from the acts, and not from the agreements, of the parties, or rather from the acts accompanied by the agreements. No trust can be set up by mere parol agreements, or, as has been said, no trust results from the breach of a mere parol

contract. So, if one agrees to purchase real or personal property, and give another an interest in it, and he purchases and pays his own money, no trust can result. Perry, Trusts, § 134; Kisler v. Kisler, 2 Watts, 323; Williard v. Williard, 56 Pa. St. 119. And so if a party makes no payment, and none is made on his account, either actually or constructively, he cannot claim a resulting trust. And a mere parol declaration by one that he is buying property for another is not sufficient to establish a resulting trust. There must be proof of an actual or constructive payment by the person claiming such a trust. Botsford v. Burr, 2 Johns. Ch. 408; Lathrop v. Hoyt, 7 Barb. 60; Jackman v. Ringland, 4 Watts & S. 149; Smith v. Smith, 27 Pa. St. 180; Dorsey v. Clarke, 4 Har. & J. 551; Fischli v. Dumaresly, 3 A. K. Marsh. 23; Sample v. Coulson, 9 Watts & S. 62; Olcott v. Bynum, 17 Wall. 44. From these considerations it results that the court erred in holding that Sieberling was entitled to $5,000 of the $20,000 of the stock subscribed for by Levi.

It is further contended by the appellant that the court below erred in decreeing that the appellees James L. Evans and Leonard Wild should each recover from him the sum of $2,872.49, besides their costs, on account of the $16,000 received by Carter and Levi from Fairbanks on account of the sale of a half interest in the patent for grinding wood pulp. The trial court was of the opinion that the $16,000 which were professedly paid as the purchase price of a half interest in a patent for grinding wood pulp were in fact paid as a bonus or additional consideration for the 1,267 shares of stock in the Noblesville Manufacturing Company sold by Levi and Carter to the American Strawboard Company, and that Evans and Wild were entitled to participate in that fund in the proportion that the stock owned by them respectively bore to the whole amount of stock on which such bonus was paid. It is admitted by counsel for the appellees that, if the $16,000 were actually paid in good faith to Levi and Carter as the purchase price of the sale of a half interest in a patent for the grinding of wood pulp, the decree of the trial court is erroneous. The decree can only be upheld on the ground that the $16,000 were in fact paid as a bonus or additional consideration for the stock owned by Levi and Carter, and which they sold to the American Strawboard Company, and that Levi, by virtue of the instrument of writing of the 15th of August, 1889, occupied such a trust relation towards Evans and Wild that they were entitled to participate in such bonus or additional consideration. We think there was evidence before the court which fairly authorized it to find that the sale of a half interest in a patent for the grinding of wood pulp was a mere cover; and that the $16,000 was really paid as a bonus or additional consideration for the 1,267 shares of stock in the Noblesville Manufacturing Company. These shares of stock were owned by Levi and Carter, and as such owners they had the undoubted right to sell the same for such price and on such terms as they chose, and to retain the whole purchase price obtained therefor unless

the agreement of August 15, 1889, operated as a limitation on such right in favor of Evans and Wild.

On the one hand, it is contended that the agreement created such trust relations between the parties to it that Levi could not sell his own stock so long as he remained the trustee of Evans, Wild, and Carter, and that he had no right to permit Carter to sell his own stock. On the other hand, it is claimed that the agreement was merely a power of attorney clothing Levi with the naked title for the purpose of sale. In our opinion, the agreement is a power of attorney, conferring on the donee of the power at the most only a dry, legal title for the mere purpose of sale, and with the power of sale carefully circumscribed. While it professes to bargain, sell, and convey shares of stock, for value received, the sale is expressly declared to be in trust for the use and benefit of the grantors. The grantee took no beneficial interest in the stock by virtue of the agreement. The power granted the right of sale only on condition that the entire shares of stock owned by Evans, Carter, and Wild should be sold in solido for cash, and not for less than twice the amounts respectively paid by each on account of such stock. This instrument constituted Levi an agent for the sale of the stock of the grantors, with powers carefully limited and defined. At the time this power of attorney was executed the grantors knew that Levi owned $40,000 of the stock individually, and held in his own name, with full authority to sell, $10,000 of the stock which equitably belonged to Sieberling. They knew that he had been endeavoring to effect a sale of his stock. The agreement in question must be read in the light of these known facts. Thus read, did the agreement preclude Levi from selling his own stock? If such limitation existed, it arose by implication, for the power of attorney contained no express limitation on his power of sale. In view of the known facts, it is fair to presume that, if any such limitation had been intended, it would have found expression in the power of attorney.

The claim that the appellant is to be held liable to the appellees because Carter violated the agreement in question by the sale of his stock is unfounded. Carter had an undoubted right to sell his own stock, notwithstanding the existence of the power; and his so doing violated no contract rights of the appellees, and, if they were harmed by it, such harm falls under the maxim. "damnum absque injuria." But, assuredly, Levi can in no way be held to respond in damages, as for a breach of trust, because of the act of Carter in selling his own stock. The fund in question arose, in no just sense, from the sale of stock owned by the appellees, or in the sale of which they had any interest. Levi sold his own stock, and on terms upon which he had no power to sell the stock of the appellees. He did not sell nor attempt to sell their stock. After selling his own stock, he procured an offer for theirs, which they were at liberty to accept or reject. There is no evidence in the record which shows that Levi could have sold the appellees' stock

on the terms of the power if he had refused to sell his own. Indeed, the evidence clearly shows that there was no possibility of selling the stock for cash in hand. Must he refuse to sell his stock, under these circumstances, on terms different from those specified in the power of attorney? The appellant sold nothing which he did not have before, and independent of the power of attorney. The power of attorney in no way aided him in selling his own stock, nor did he derive any advantage or profit from the possession of such power. The appellees have no legal or equitable right to claim any part of the price obtained by the appellant for his own property. If they can impute any wrong to the appellant, it is in selling his stock instead of selling theirs. But there is no proof in the record that tends to show that he could have sold their stock on the terms specified in the power of attorney, if he had refused to sell his own. When he found it impossible to sell the stock of the appellees under the terms of the power, we do not think he owed them the duty of refusing to sell his own.

In our opinion, the court ought to have dismissed the bill of Evans and Wild, at their costs. The appellant is properly decreed to account to Sieberling for the proceeds of the sale of the $10,000 of stock held in trust for him, including his proportionate share of the bonus or additional consideration received. The amount of stock owned and sold by Levi on his own account was $40,000, and the amount belonging to Sieberling was $10,000. The amount of the bonus or additional consideration received by Levi, and with which he is chargeable, is $12,590.80. All sums of money paid by Levi on account of the Sieberling stock will be taken into the account, and interest may be allowed on the several sums of money properly chargeable to each.

The several causes are hereby reversed at the costs of the appellees, and remanded to the court below, with instructions to proceed in conformity with the principles contained in the foregoing opinion.