PACIFIC COAL & TRANSPORTATION CO. et al. v. PIONEER
MINING CO.

(Circuit Court of Appeals, Ninth Circuit. May 5, 1913.)

No. 2,150.

**1.** EQUITY (§ 53*)—QUIETING TITLE (§ 34*)—TRIAL (§ 11*)—EQUITY JURISDIC-
TION—PLEADING.

Where the complaint in a suit to quiet title, brought under Code Civ.
Proc. Alaska, § 475, which authorizes such a suit of an equitable nature
by one in possession, alleged title and possession in plaintiff, it stated a
cause of action of equitable cognizance; and where defendant not only
joined issue on such allegations, but alleged title and possession in itself
and prayed for a decree quieting its title, it waived any objection to the
equitable jurisdiction, and was not entitled to an order transferring the
cause to the law calendar for trial to a jury.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 173–176; Dec.
Dig. § 53;* Quieting Title, Cent. Dig. §§ 69, 71, 72, 76, 77; Dec. Dig. §
34;* Trial, Cent. Dig. §§ 28–30; Dec. Dig. § 11.*]

**2.** APPEAL AND ERROR (§ 974*)—EQUITY (§ 377*)—HEARING—SUBMISSION OF
ISSUES TO JURY—DISCRETION OF COURT.

The submission of questions of fact to a jury in an equity case rests
in the sound discretion of the court, and its refusal to do so cannot be
reviewed, except for an abuse of discretion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3858,
3859; Dec. Dig. § 974;* Equity, Cent. Dig. §§ 788–793; Dec. Dig. § 377.*]

**3.** CONTINUANCE (§ 16*)—DETERMINATION OF MOTION—DISCRETION OF COURT.

The denial of a motion for continuance in an equity case, made to en-
able the defendant to retake the deposition of a witness, *held*, on the
showing made, within the discretion of the court.

[Ed. Note.—For other cases, see Continuance, Cent. Dig. §§ 38, 39; Dec.
Dig. § 16.*]

4. MINES AND MINERALS (§ 49*)—ADVERSE POSSESSION—MINING CLAIM.

The going upon a placer mining claim by one without title and from
time to time digging shafts or prospect holes, by himself or lessees, in
different places, and the actual working of some of such places for short
times, in all not exceeding a year or two, although continued for the
statutory period, does not constitute such actual, exclusive, and continu-
ous adverse possession of the entire claim as will give title as against
the record owner, who has kept up his annual assessment work.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 135;
Dec. Dig. § 49.*]

**5.** ESTOPPEL (§ 93*)—EQUITABLE ESTOPPEL—ACQUIESCENCE—PERMITTING EX-
PENDITURES ON MINING CLAIM.

Where the trespasser in such case expended no large sum on his ex-
plorations, and was several times warned by the owner to keep off the
claim, the latter was not estopped to assert its right by a suit to quiet
its title thereto.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 264–275; Dec.
Dig. § 93.*]

**6.** JUDGES (§ 51*)—DISQUALIFICATION TO ACT—SUFFICIENCY OF OBJECTION.

Under Code Civ. Proc. Alaska, §§ 707, 708, the filing of an affidavit by
a party, stating his belief that the judge is biased and prejudiced, giv-
ing no reasons in its support, does not disqualify the judge, nor render

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

it error for him to deny a motion to assign the cause for trial before another judge, involving a delay of six months.

[Ed. Note.—For other cases, see Judges, Cent. Dig. §§ 224–231; Dec. Dig. § 51.*]

Appeal from the District Court of the United States for the Second Division of the District of Alaska; Cornelius D. Murane, Judge.

Suit in equity by the Pioneer Mining Company against the Pacific Coal & Transportation Company and M. D. McCumber. Decree for complainant, and defendants appeal. Affirmed.

Albert H. Elliott, of San Francisco, Cal., Wm. A. Gilmore, Geo. B. Grigsby, and Elwood Bruner, all of Nome, Alaska, for appellants.

G. J. Lomen and O. D Cochran, both of Nome, Alaska, and Metson, Drew & MacKenzie, of San Francisco, Cal., for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This suit was instituted by the Pioneer Mining Company, the appellee here, to quiet the title to a certain mining claim, known as Bench claim No. 1, on Moonlight creek, in the Cape Nome recording district, district of Alaska.

The defendants deny the right of plaintiff to have its alleged title to such mining claim quieted, and aver that the defendant the Pacific Coal & Transportation Company is the owner and entitled to the possession of a mining claim known as Bench No. 1, at the base of Anvil Mountain, also called the "Moonlight" or "Grant" claim, situated in the same recording district, and seek to have its title to said claim quieted as against the claim of plaintiff. Defendant McCumber is an alleged lessee of the Transportation Company, and holds whatever right or interest he has in the claim subserviently to that company. Other specific defenses are pleaded. The defendants' claim, as described by them, overlaps or conflicts in certain considerable area with the plaintiff's alleged claim, and the controversy here is concerning the conflict area.

After the pleadings were settled, the defendants each moved the court for an order assigning the cause for trial on the jury calendar. These motions were denied. Thereupon other motions were interposed, requesting the court to refer certain questions of fact to a jury, which were also denied. The action of the court with respect to these motions is assigned as error.

[1] As it respects the motion to have the cause assigned to the jury calendar, it is urged that the suit is possessory in its nature, and that plaintiff has a plain, adequate, and complete remedy at law, and hence that the court erred in refusing a trial by jury.

The question is one to be determined wholly from the pleadings, as no evidence had been introduced or heard at that stage of the proceedings.

The complaint exhibits a cause for quieting the title to the premises in dispute. It alleges title and possession in the plaintiff, and that defendants claim some interest therein adverse to such title, the exact

nature of which is unknown to plaintiff. The prayer is, in effect, that the court decree that the plaintiff's title is good and valid; that the defendants have no interest in the premises; and that they be restrained from asserting any claim whatsoever adverse to the title of the plaintiff. It thus appears upon the face of the complaint that the suit is one simply for quieting the title of the plaintiff in the premises in dispute. In this connection it will be further observed that the defendants, after denying title and possession in the plaintiff, in effect allege title and possession in the defendant Transportation Company; it being further alleged that McCumber is in possession under a lease from the Transportation Company. They pray that the Transportation Company be decreed to be the owner in fee of the premises; that its title be quieted and confirmed subject to the leasehold estate of Mc-Cumber; and, further, that plaintiff be held to have no interest or estate in the premises in dispute, and that it be barred and enjoined from asserting any interest whatsoever therein. Six other further separate answers are interposed. The second asserts adverse possession in the Transportation Company continuously since January 9, 1899, in the whole of the Grant claim, under and by virtue of a valid location made of that date, and under claim and color of title. The third asserts that on the 7th day of November, 1910, the date on which the suit was instituted, and for a long time prior thereto, defendants were in the exclusive and notorious possession of the whole of the said Grant claim by virtue of the mineral location of January 9, 1899, and that McCumber was actively engaged in prospecting and mining upon the area comprised by the overlap, being the immediate ground in dispute, and had a cabin thereon and his tools, implements, and mining equipment, and that the plaintiff was not then in possession of any part thereof. The fourth that plaintiff is estopped to assert ownership and right of possession in the premises, because the defendants for more than seven years have been in the actual, open, notorious, and continuous possession of the Grant claim and of the conflict area, with full knowledge and notice on the part of the plaintiff, and without objection or interruption on its part, and that the Transportation Company and its lessees have expended large sums of money in mining and developing said conflict area, without objection from plaintiff. The fifth simply asserts that at all times mentioned in the complaint the Transportation Company, its grantors and predecessors, were in the adverse possession of the premises now being mined by it and its lessee, and have at all of said times been owners under and by virtue of a valid mining location regularly made upon the ground, and that the said Transportation Company and its lessee are in possession and entitled to the possession of the same. The sixth asserts adverse possession for a period of more than ten years immediately prior to the commencement of the suit. The seventh sets up estoppel on account of a decree made and entered in certain injunction proceedings.

It has ever been held that a cause for removing cloud from title, or quieting title, or by way of bill of peace, is equitable, and appeals to a court of equitable cognizance. Formerly, to maintain a suit for quieting title or removing cloud therefrom, it was essential for the

plaintiff to show that he was in possession of the property, that he had been disturbed in possession by repeated actions at law, and that he had established his right by successive judgments in his favor. Upon such facts appearing, the court would interpose to quiet the title of plaintiff by granting a perpetual injunction against further litigation from the same source. To maintain a bill of peace, it was generally necessary that the plaintiff should be in possession of the property, and, except where the defendants were numerous, that his title should have been established at law, or be founded upon undisputed evidence of long-continued possession. Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52; Curtis v. Sutter, 15 Cal. 259.

Local statutes in different states have interposed to relieve against the cumbersome requirements of the old law, and where the statute accords the plaintiff an action for quieting his title, he being in possession and proceeding under a claim of right founded upon title, legal or equitable, the action is regarded as proper for the cognizance of a court of equity, and equitable relief will be accordingly granted. Stark v. Starr, 6 Wall. 402, 18 L. Ed. 925; Clark v. Smith, 13 Pet. 195, 10 L. Ed. 123; Curtis v. Sutter, supra.

In Oregon the statute has gone even further, and it is sufficient to maintain the suit if the lands in controversy are not in the actual possession of another, thus including lands vacant or unoccupied. Moore v. Shofner, 40 Or. 488, 67 Pac. 511; Winchester v. Hoover, 42 Or. 310, 70 Pac. 1035; Ladd v. Mills, 44 Or. 224, 75 Pac. 141; Holmes v. Wolfard, 47 Or. 93, 81 Pac. 819.

That such a statute prescribes an equitable remedy, and that the suit is maintainable in equity, is practically held in Holland v. Challen, supra.

Under the Alaska statute (section 475, Code of Civil Procedure):

"Any person in possession, by himself or his tenant, of real property, may maintain an action of an equitable nature against another who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate, or interest."

The statute is not materially different from that which formerly obtained in Oregon. The suit in controversy is concededly brought under that statute. If the complainant is well within the statute, there can scarcely remain a doubt of his right to proceed in equity, and it will follow that defendant has no right to a trial by jury.

The seventh amendment to the Constitution of the United States declares that:

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

This declaration of the Constitution was applied in Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276, 34 L. Ed. 873, wherein the plaintiff alleged that he was the owner in fee simple of certain premises, holding as trustee, and that defendants were in possession claiming title under certain documents purporting to be transfers of the same, which were fraudulent and void. It was held that the bill would not lie, because the plaintiff, being out of possession, had a plain,

speedy, and adequate remedy at law, wherein both parties would be entitled to a jury. The case of Holland v. Challen, supra, is distinguished on the ground that no one was there in possession; the court saying:

"No adequate relief to the owners of real property against the adverse claims of parties not in possession can be given by a court of law. If the holders of such claims do not seek to enforce them, the party in possession, or entitled to the possession—the actual owner of the fee—is helpless in the matter, unless he can resort to a court of equity. It does not follow that by allowing in the federal courts a suit for relief under the statute of Nebraska, controversies properly cognizable in a court of law will be drawn into a court of equity. There can be no controversy at law respecting the title to or right of possession of real property when neither of the parties is in possession. An action at law, whether in the ancient form of ejectment or in the form now commonly used, will lie only against a party in possession. Should suit be brought in the federal court, under the Nebraska statute, against a party in possession, there would be force in the objection that a legal controversy was withdrawn from a court of law; but that is not this case, nor is it of such cases we are speaking."

Thus it would seem that, had the plaintiff in Whitehead v. Shattuck been in possession and the defendants out, the court would have held otherwise, and consequently the parties would not have been entitled to a jury. The Holland v. Challen case is again distinguished, along with the case of Clark v. Smith, supra, in Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358, in a way to leave no doubt of the court's adherence to the principles therein determined. It says specifically:

"In that suit neither party was in possession, and the jurisdiction was maintained in equity, as no remedy in such case could be afforded in an action at law."

By how much stronger reasoning would the plaintiff be entitled to maintain his suit in equity where he is in possession and the defendant is not. In such case, the cause being equitable, neither party would be in a position to invoke the constitutional provision of the United States, because the suit is not one at common law, and the plaintiff is without a plain, adequate, and complete remedy at law.

The California cases cited, namely, Donahue v. Meister, 88 Cal. 121, 25 Pac. 1096, 22 Am. St. Rep. 283, Newman v. Duane, 89 Cal. 597, 27 Pac. 66, Gillespie v. Gouly, 120 Cal. 515, 52 Pac. 816, McNeil v. Morgan, 157 Cal. 373, 108 Pac. 69, Davis v. Judson, 159 Cal. 121, 113 Pac. 147, and Angus v. Craven, 132 Cal. 691, 64 Pac. 1091, are based upon a statute which provides that an action may be brought by any person against another who claims an estate or interest in real property, for the purpose of determining such adverse claim, which is very different from the Alaska statute. These cases but follow the general rule elsewhere, that where the plaintiff is out of possession and the defendant in either party is entitled to a jury; that where such is the real position of the relative parties the plaintiff could not deprive the defendant of his right of a jury trial by framing his complaint in a particular way; and that whether an action involves legal issues or issues of equitable cognizance must depend upon the facts alleged in the particular case.

Now, the allegations of plaintiff's complaint show the action to be equitable. The defendants' denial of possession on the part of the plaintiff cannot oust the court of equity of jurisdiction. If the denial was substantiated at the trial, the issues there remaining, it would defeat the action, because plaintiff would not then have maintained its cause. But another feature is injected into the controversy here, which is controlling. The defendants have not only joined issue with the plaintiff touching the equitable cause as pleaded, but they have set up a like cause, and pray equitable relief, and at the same time they have interposed one or more equitable defenses. By so doing, they have waived their objection to the equitable jurisdiction, and cannot now be heard to insist upon the legal remedy. Levi v. Evans, 57 Fed. 677, 6 C. C. A. 500; Book v. Justice Min. Co. (C. C.) 58 Fed. 827; O'Hara v. Parker, 27 Or. 156, 39 Pac. 1004; State v. Blize, 37 Or. 404, 61 Pac. 735.

Says the Court of Appeals for the Seventh Circuit in Levi v. Evans:

"If a defendant in a suit in equity answers and submits to the jurisdiction of the court, it is too late for him to object that the plaintiff has a plain and adequate remedy at law. 1 Daniell, Ch. Pr. (4th Amer. Ed.) p. 555; Reynes v. Dumont, 130 U. S. 395, 9 Sup. Ct. 486 [32 L. Ed. 934]; New Orleans v. Morris, 105 U. S. 600 [26 L. Ed. 1184]. Good faith and an early assertion of rights are as essential on the part of the defendant as of the complainant. Brown v. Iron Co., 134 U. S. 530, 10 Sup. Ct. 604 [33 L. Ed. 1021]."

We conclude, therefore, that the trial court did not err in refusing to assign the cause to the jury calendar for trial before a jury.

[2] As to the right of defendants to have certain questions of fact propounded to a jury for determination, the cause being equitable, that was a matter submitted to the sound discretion of the trial court, and its judgment in the premises can only be reviewed for an abuse of that discretion. Raymond v. Flavel, 27 Or. 219, 40 Pac. 158. We find no abuse of the court's discretion as to the question urged, and hence there was no error.

[3] Error is assigned upon the court's refusal to continue the cause for the purpose of retaking the deposition of Andrew Jensen. The deposition of the witness had previously been taken at the instance of the defendants, but when it was returned to the court and published it proved not to support their cause as strongly as they had expected; hence they did not offer the deposition at the trial. But the plaintiff did so offer it, and it was read in plaintiff's behalf. The purpose of retaking the deposition of Jensen, as shown by the affidavit of the defendant McCumber for a continuance, was to put the defendants in a position to impeach the testimony first given by Jensen, anticipating plaintiff's use of it.

Tom D. Jensen, a son of Andrew, had had some correspondence with his father with reference to the location of Bench No. 1 on Moonlight as made by Jensen, and its relation to the Grant location, eliciting a couple of letters which, as to some statements made therein, contradict in a way the testimony given by the father by deposition. Accompanying the first letter was a map or plat of the placer claims in the vicinity of Moonlight Springs, purporting to show the location of plaintiff's claim as staked on the ground by Jensen. After stating these

facts, McCumber further avers: That after the receipt of both these letters and the map he sued out a commission to take the deposition of Jensen at Fargo, N. D., and propounded his interrogatories as prompted by the information thus received. That prior to suing out the commission he caused the son to cable Jensen to come to Nome, offering to pay his expenses, and in response to the telegram the son received one from Jensen, which reads:

"Pioneer Company here wanted me come Alaska their expense requested wire twelve hundred dollars Buffalo Bank to pay time expenses would then go."

That Jensen, in his deposition, contradicted the material statements made in his said letters to his son and in said telegram, and the facts as shown by said map. That the purpose of retaking Jensen's deposition was that his attention might be called to said letters and original map, so that if witness denied that he ever made the statements therein contained, or that he made said map or sent said telegram, defendants could prove the contrary; or, if he admitted them, then that the same could be introduced at the trial to impeach said witness; if his evidence in the former deposition was contrary thereto, to show and prove that he made contradictory statements. It is further averred that defendants expected to prove by Jensen that he received the sum of $1,200 at Buffalo, N. D., from plaintiff or its agents, and the manner and method by which said money was paid; and, further, that Jensen, at the time he answered the second letter of his son, had a blueprint of the ground in controversy, made by Arthur Gibson in 1902, similar to the one offered in evidence by plaintiff on cross-examination at the taking of said deposition at Fargo, N. D., and that he was unable to identify the position of the claim in the vicinity of Moonlight Springs.

Andrew Jensen was a very material witness for plaintiff, and he deposed principally respecting the location of claim No. 6 Below Good Luck, the Moonlight claim, Bench No. 1 on Moonlight, and the Grant claim. To have impeached his testimony would, of course, have weakened plaintiff's case. All the interrogatories propounded to witness do not accompany the record, so that their exact form does not appear as fully as might be; but it does appear that Jensen, while testifying, had in his hands a map, and that some five years previously a representative of an Eastern company came to his place with a similar map and wanted witness to give him the location of the Grant claim, which he did about as he remembered it. This map was offered in evidence by plaintiff's counsel, and is marked "Plaintiff's Exhibit B," but in effect it is a contortion of all the maps appearing in evidence that are at all authoritative. The witness disavowed the correctness of this. Witness also had before him another map, handed to him by a Mr. Holt, of Fargo, N. D., which was similar to Plaintiff's Exhibit H, and he pointed out on this map where he thought the claims were located. This was on redirect examination, and it would seem that if defendants were at all relying upon the map which McCumber alleges the witness sent to his son they had then the opportunity of calling his attention to it, which they omitted to do. So of the letters writ-

ten by Jensen to his son. The defendants had them in their possession at the time, and thus had the opportunity of calling his attention to them, by way of refreshing his memory, if for nothing else, and so of procuring, in practical effect, the testimony now sought to be adduced. As to the alleged receipt of $1,200 by Jensen from plaintiff at Buffalo, N. D., it is quite probable that McCumber had no further evidence of that than the telegram that Jensen sent to his son.

In the determination of the motion for a continuance the trial court was vested with a sound discretion, as in the matter of submitting certain questions of fact to a jury in an equitable cause, and we are unable to discover any abuse of that discretion. Hence we find no error in the court's denying the motion.

We will now examine the case upon the facts.

The plaintiff has succeeded by record title to the Andrew Jensen claim, Bench No. 1. This much is conceded. While plaintiff was offering testimony to show its record title, counsel for defendants interjected, saying:

. "We now stipulate that the Jensen record title to Bench claim No. 1 on Moonlight is in the plaintiff."

We will hereafter refer to this claim as "Bench No. 1." This claim was located by Andrew Jensen on the 3d day of January, 1899. The mining location filed for record is in the following language:

"Cape Nome Mining District, January 3, 1899.
"Moonlight Creek Bench Claim No. 1.
"I the undersigned claim 1,320 feet towards Anvil Mountain and 660 feet towards Moonlight creek, being bounded N. W. by Moonlight claim, in the east by Moonlight claim.                                Andrew Jensen.
"Witnesses:
    "O. Schueler.
    "C. L. Spanggard."
"Filed for record 1:15 p. m., Jan. 17, 1899.  Vol. 3—64."

Jensen explains that "by Moonlight claim," describing the east boundary, was a mistake, and that it should have been the "Nelson bench claim."

Jensen at the same time located claim designated as "No. 6 Below Good Luck." Between this claim and Bench No. 1 was a claim previously located, known as Robert Lyng's Moonlight claim. Witness says that his Bench No. 1 joined the Robert Lyng or Moonlight claim on the east, and extended on the easterly side further up towards Anvil Mountain than the Lyng claim. Jensen made discovery of gold at the time upon the claim, and also staked it, using willow stakes about four feet long and two or three inches in circumference; one side of each corner stake being blazed with an axe, and having written thereon with a lead pencil, "Bench No. 1 Moonlight." On one stake the location notice was attached by splitting the end at the top and slipping the notice in. There is little dispute as to the fact that the requisite assessment work was done on some part of this claim by Jensen and his successors in interest down to the time of the institution of the present suit.

On January 9, 1899, one W. N. Grant executed a notice of location in the following language:

"Notice of Location Claim No. 1 Bench, Cape Nome Mining District.

"I the undersigned do this the 9th day of Jan. 1899, locate and claim 20 acres of placer mining ground on the mountain known as Anvil, described as follows:

"Commencing at eastern end of Robert Lyng's Moonlight claim and extending in an easterly direction 1,320 ft. & 330 ft. on each side of the center stake. This claim is located on the western base of Anvil Mt.

"W. N. Grant, Locator.

"Witness: Andrew Jensen.

"Filed for record 10:10 p. m., Jan. 17, 1899. Vol. 3—59."

The witness is the same person who located Bench No. 1. Claim No. 1 Bench will hereafter be referred to as the "Grant Claim." Jensen relates that Grant "only put down one stake," and said that was enough. Witness further states that "Grant just put in one willow stake right up by the side of one of mine on No. 6 Good Luck—on the upper part towards the mountain;" that the Grant claim could not join the Lyng claim, except possibly at one corner; and that it did not conflict in any way with any of the exterior boundaries of the Lyng claim or of Bench No. 1. On cross-examination witness further says:

"Grant placed one middle stake at one of my corners towards Anvil Mountain on the upper side of No. 6 Good Luck."

Jensen saw the stakes on the claim in the summer of 1900, and they were in the position as he located them in the first place.

On September 9, 1902, Arthur Gibson made a survey of Bench No. 1; Spanggard being with him. It will be noted that Spanggard was a witness on Jensen's notice of location. Gibson reset the stakes with 2x4 pine stakes, marked Nos. 1, 2, 3, and 4, and with the initials "M. B." to indicate Moonlight Bench. The willow stakes set originally to mark the location of the claim were found and identified by Spanggard. The survey was made at the instance of D. W. McKay, who was then the owner or had some interest in the claim. The southwest corner stake was made the initial corner.

Louis Stevenson, who was the assistant manager of the Pioneer Mining Company from 1901, went over all these corner stakes in the fall of 1903, and identified each of them by the scribing put upon them by Gibson. Witness further details some displacing that had occurred with one or two of the corner stakes. The stakes were reset in 1909 or 1910 for the purpose of maintaining the corners.

Thomas Lyle saw the stakes planted by Jensen, in locating his claim, at the southeast and northeast corners of Bench No. 1, about June 7, 1899, and noted the lead pencil markings upon them as written by Jensen to denote the corners. C. J. Jorgensen examined all the corner stakes of the Jensen claim in July, 1899.

From this testimony it would seem that the practical identification of Bench No. 1 is complete.

As it relates to the Grant claim, A. C. Kingsbury states that he took an option to purchase from Grant in July, 1899; that he was acquainted with the initial stake, which, he says, was at the same place

as the initial stake of the Lyng claim, being the center stake on the easterly end thereof. It should be stated here that, according to the surveys and plats offered and received in evidence, there is an apparent conflict between Bench No. 1 and the Lyng claim, and that Bench No. 1, as surveyed by Gibson, comprises a large segment of the Lyng claim, including more than three-fourths of the eastern boundary line thereof. But the question presented is not which of these claims, Bench No. 1 and the Lyng claim, is valid, if considered one against the other, but which of the two claims, Bench No. 1 and the alleged Grant claim, is entitled to prior location, and has the better right for substantiation as a subsisting and valid claim. The Lyng claim early passed from its locator, and thence into the hands of the plaintiff company, and, that company having succeeded to the right of Bench No. 1, any conflict of boundaries could not now be a matter of dispute. But, of course, the conflict in these claims becomes material in determining the relative validity of the location of Bench No. 1 and the Grant claim. Jensen insists that there was no conflict between his Bench No. 1 and the Lyng claim. He marked his own claim upon the ground, and at the same time knew the position of the stakes and corners of the Lyng claim. Whether he is right or wrong in this, the conflict area between Bench No. 1 and the Grant claim comprises no part of the Lyng claim, and the location of Bench No. 1 might well be prior in time and perfectly valid as against the Grant claim and subservient in right to a part of the Lyng location. In reality, the most important question involved is the true location of the initial stake denoting the location of the Grant claim.

Now, to return to the testimony of Kingsbury. He says the initial stake of the Grant claim was pointed out to him by Grant, and that he knew where the corner stakes were marked on the ground, and that such stakes are the same to-day as they were then—the last of July or 1st of August, 1899—except that they have been re-established and mounds of earth thrown up about them, and that he did not observe any markings or monuments of any kind of any claim within the boundaries of the Grant claim. A few days later Grant found "good colors of gold." This was within the conflict area. They also found that some one had been "sniping" at the place where Grant had first worked.

Now, Bench claim No. 1, located by Jensen as delineated by him, and the Grant claim as designated by Kingsbury conflict by a considerable area, in that the Grant claim comprises the easterly end of Bench claim No. 1, in an irregular shape, including the northeasterly and southeasterly end stakes. It is this conflict area that is in dispute here.

Kingsbury took a second option on the Grant claim in the latter part of August, 1899. The Corwin Trading Company, a company organized by Kingsbury, succeeded to this option. The option was of an undivided one-half interest in the Grant claim, and the defendant Transportation Company succeeded to the right of the Corwin Trading Company. Kingsbury also testifies that the Transportation Company advertised Grant out of his remaining interest in such claim.

The Transportation Company was organized by Kingsbury in 1901, for the purpose of taking over the properties of the Corwin Company. Prospecting work was done on the claim in the years 1899, 1900, and 1901. A. D. Rogers and Mike Leary, who were anticipating taking a lay, did some prospecting work in the latter year. It is not specific that any of this work was done within the disputed area, except it is said that the shaft dug by Kingsbury in 1901 "must have been" within such area. Kingsbury filed an amended location of the claim on October 7, 1901. In the summer of 1902 some work, consisting of digging on the lower end of the claim, was done at the instance of Kingsbury; some of it being within the disputed area. During the summer he had some pine stakes erected at the corners, with the corner numbers painted upon them, running from 1 to 5.

In July, 1902, as agent of the Transportation Company, Kingsbury gave a lease on the Grant claim to P. D. Winter and George Crawford for the mining season of that year. He relates that they performed work under the lease; that he was not there when they were working, but he knows they worked down where the railroad now is and within the ground in controversy. Kingsbury employed Gibson to survey the claim, which was done September 30th of that year. Kingsbury quit the employment of the Transportation Company the first of the year 1903, and Miss E. L. Howard took his position. He was back, however, on the Grant claim in 1905, and observed work being done thereon by Bard and Muther, which was on a portion of the ground in controversy. He further says:

"Their work was on that portion of the ground in controversy that was done on the Grant claim in 1906."

Kingsbury gave another lease to Howard and Doverspike, in the fall of 1902. These men took out dumps on the southwest end of the claim and within the area in controversy. Kingsbury further relates that no one made any claim to the ground where these parties were working while he was in the employ of the company. On cross-examination he testifies that he passed around the Grant claim with Grant, and that when they came to the northwest corner stake Grant, being a man of many words, "exploded when he found the notice was gone, and called my attention to that particular fact by his remarks."

Miss E. L. Howard, who succeeded Kingsbury in charge of the Transportation Company property, testifies that she had charge in 1902 and 1903, and saw the west end stakes of the Grant claim— "three blazed willow stakes with the name of Grant on them."

Robert Lyng testifies that he located the Lyng claim in the latter part of November, 1898; that Grant had a claim staked out in the vicinity of his to the east, of which the initial stake was identical with his; that Grant told him that that was his initial stake; that such claim was located from witness' upper end line extending easterly.

This constitutes a brief résumé of the testimony touching the location of the two claims, Bench No. 1 and the Grant claim.

One thing appears to be clearly proven, which is that Bench No. 1 was located anterior to the Grant claim by six days; the Bench being located on January 3, 1899, and the Grant claim on the 9th. There

is a conflict in the testimony respecting the initial stake of the Grant claim. Jensen fixes it at the northeast corner of No. 6 Below Good Luck; the defendants' witnesses at the east end initial stake of the Lyng claim. If the latter is the true location, then an extension of the claim would involve a part of Bench No. 1. This is undisputed. Kingsbury says that Grant pointed out to him the initial stake as being at the point of the initial stake of the Lyng claim, but he says, on cross-examination, that Grant "exploded" when he found that his notice had been removed from the stake at the northwest corner, the place where Jensen says Grant planted his initial stake, and the only one that he put down at the time to mark the boundaries of his claim.

The notice is usually affixed to the initial stake, and in this respect Kingsbury corroborates Jensen as to the locality of Grant's initial stake. Grant's location notice corroborates this view, as the 20 acres of mining ground claimed is designated as "on the mountain known as Anvil," which takes it away from the ground in dispute; such ground not being on the mountain, or, if at all, only slightly. The northeast corner of No. 6 Below Good Luck is situated westerly from the northeast corner of Bench No. 1, and distant approximately 150 feet. The easterly line of Bench No. 1, if extended westerly, would nearly intercept the northeast corner of No. 2 Good Luck, so the Grant claim could very well adjoin the easterly boundary of Bench No. 1 and the former be regularly located under the Grant notice of location. Jensen was a witness to the Grant location, and it is not at all likely that he would accord his assent to Grant's locating a claim in direct conflict with his own, located only six days previously, nor at all probable that he did. Furthermore, when Gibson made the survey of Bench No. 1 on September 9, 1902, Spanggard, who was a witness to the Jensen location, was with him and identified and pointed out the corner stakes, and the survey was made accordingly. Miss Howard seems to lend support to the location of the Grant claim as claimed by Grant, namely, that his initial stake corresponded with the initial stake of the Lyng claim in location, and Kingsbury in a way corroborates her. His filing of the amended location of the Grant claim may have been in good faith, and yet the very precaution thus taken suggests suspicion and doubt. But we are led to believe that Grant's true initial stake was located at the northeast corner of No. 6 Below Good Luck, as designated by Jensen. Such being the case, there could be no conflict of the Grant claim with Bench No. 1. However this may be, Jensen acquired the prior and superior location, and the conflict area must be subordinated to such location, unless it be that the Transportation Company has acquired title and the superior right of possession thereto by adverse possession, or through estoppel operating to preclude plaintiff from claiming such title or right of possession. Of this we will now inquire.

[4] Francis M. Warsing observed Winter and Crawford working on the Grant claim and within the ground in controversy in the summer of 1902, and Doverspike, Williams, Schue, O'Leary, and Howard working therein in September of the same year. They were digging shafts—several of them. He says they commenced in 1902 and worked

continuously until May, 1903, and did sluicing and actual mining in the spring of 1903; that they washed up a portion of the dumps taken from the shafts, and Hopkins and Muther washed up what remained in 1903. He further says that Muther and Bard were working on the disputed area in the fall and winter of 1903 and the spring of 1904; that in the summer of 1904 Muther and Hopkins worked on the west end of the Grant claim, and that witness did some prospecting on the Grant claim; that he observed further work on the Grant claim in the fall or winter of 1904 and spring of 1905, the operations being carried on by Oscar Margraf and John Rieck.

Ai Brown testifies that he worked with Muther and Bard within the disputed area in 1905; that he sank two shafts and worked underground stoping out and running drifts; that Muther and Bard lived in a cabin just east of the railroad track; that he saw Margraf and Rieck working on a portion of the Grant claim in 1904, and some Russians sinking shafts in the fall of 1905.

Isaac J. Kortright worked on the Grant claim in the spring of 1907, and assisted in removing a drill from the premises, from the first plateau or bench, and a hole was drilled, while he was working there, something like 60 feet in depth.

Albert Hartman worked in 1907 for Louis Woods, who was under Captain Sperry. Witness worked for two days.

S. D. Waysman did drilling with the same man, Woods.

W. H. Bard was attorney for the Transportation Company from June, 1903, until June, 1906, and had a lease on the Grant claim in 1904 and 1905 with J. C. Muther. They extracted winter dumps within the conflict area. As attorney Bard executed leases to Hopkins and Belvail and Margraf and associates. Hopkins and Belvail worked upon the property during the summer of 1905. Margraf and associates worked all over the claim, but the others worked within the conflict area, and the Pioneer Mining Company did not enter any protest, so far as witness knew, but did go upon the claim in his absence and do some assessment work. In 1904 Mr. Lindeberg sent a man over with a request to stop working, but witness put the man off the claim.

S. Lynn Fox testifies that he and his associate, Ben Hersey, contracted with defendant McCumber to sink a shaft on the claim; that they commenced December 8, 1908, and worked until April 20, 1909, and sank a shaft 84 feet deep; that they lived at that time on the Grant claim.

Adolph Meyer testifies that he moved a red cabin upon the Grant claim, and just within the disputed area, on November 3, 1909; that he and others sank a hole 17 feet deep and excavated other shafts afterwards; that he had an arrangement with McCumber to sink a shaft 150 feet deep; that he worked off and on, and lived in the red cabin while at work, until the 13th of March, 1911.

McCumber says he worked on the Grant claim in the years 1908, 1909, 1910, and 1911, and had a lease from the Transportation Company. He, through Meyer, was in possession of the cabin at the time this suit was instituted. Other witnesses corroborate this in many

particulars, but it is unnecessary to recite their evidence. It does not change the general import of what has been delineated.

On the other hand, Lindeberg, who was president of the Pioneer Mining Company, testifies that he complained to Bard, Charles Butler, Hopkins, and Grant, advising them that the company was the owner of the ground, and that he told Muther several times that such was the case. He was afraid of Hopkins, and avoided a personal encounter.

Arthur Gibson testifies that he told McCumber to stay off the conflict area and save his money.

The Code of Civil Procedure of Alaska prescribes that actions for the recovery of real property, or for the possession thereof, shall be commenced within ten years, and that:

"No action shall be maintained for such recovery unless it shall appear that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within ten years before the commencement of the action." Sections 3 and 4, Carter's Ann. Alaska Code.

Section 1042 of the same Code provides:

"The uninterrupted, adverse notorious possession of real property under color and claim of title for seven years or more shall be conclusively presumed to give title thereto except as against the United States."

The defendants invoke both of these statutes by their pleas in defense. The apparent difference between the two statutes, aside from the specific time of their running, is that the latter requires the adverse possession to be founded upon color as well as claim of title. .

Proceeding to the inquiry, it is settled law that:

"The constructive possession of land is always in the holder of the best title, unless he has renounced it; and this constructive possession can never be ousted by anything less than an actual possession maintained for the necessary period." 1 Cyc. 982.

Says the court in Bliss v. Johnson et al., 94 N. Y. 235, 242:

"The settled principles of law require courts to consider the true owner as constructively in possession of the land to which he holds the title, unless they are in the actual hostile occupation of another under a claim of title."

See, also, Archibald v. New York Central & H. R. R. Co., 157 N. Y. 574, 52 N. E. 567, and Troxell v. Johnson, 52 Neb. 46, 71 N. W. 968.

There cannot be constructive possession in two persons claiming to hold adversely at one and the same time. Hence in the present case, the plaintiff having the better and superior right and title, the defendants' alleged adverse possession cannot avail them, unless it has been actual and continuous, as constructively the plaintiff is in possession by reason of its superior title and right.

Actual possession means a pedis possessio which is definite, positive, and notorious. As expressed by Mr. Justice Strahan, in Joy v. Stump, 14 Or. 361, 364, 12 Pac. 929, 930:

"It is equally well settled that when a person relies upon naked possession as the foundation for an adverse claim there must be an actual occupancy, and the possession cannot be extended by construction beyond the limits of the actual occupation, and such possession must not only be actual, but also

visible, continuous, notorious, distinct, and hostile. and of such a character as to indicate exclusive ownership in the occupant."

This imposes the burden upon the defendants of establishing their claim of adverse possession by actual, as contradistinguished from constructive, possession, and this must be continuous, open, notorious, and exclusive.

We are clear that they have fallen short of maintaining their defense upon this basis. The only possession the defendants, their lessee, agents, and employés, have had is to go upon this disputed area from time to time to prospect for gold. They have sunk shafts and run tunnels and dug upon the surface at one place and another within the area, but have for no great length of time, say beyond a year, eighteen months, or two years, mined in any definite locality. They have shifted about, as prospectors will, digging holes here and there, and panning for colors, with the hope and view of making discovery at some point. But no discovery in paying quantities seems to have been made until at a recent date by some of the employés of McCumber. But few of the prospectors claim to have lived upon the conflict area. Muther and Bard lived in a cabin on the premises somewhere about the year 1905, but this cabin was taken away, and later, on November 3, 1909, the red cabin was moved just across the line thereon by Adolph Meyer. This cabin has remained there since, and has been occupied from time to time by McCumber's agents and employés. We look in vain for an unbroken actual possession in any one specifically defined locality for any considerable length of time, and even as to such possession as the defendants may have had, they were notified from time to time of the rights of plaintiff in the premises. So on the whole we are convinced that there has been no adverse possession by the defendants of the disputed area, or any specific part of it, for ten, or even for seven, years, and that their defense on that theory must fail.

This inquiry has proceeded upon the hypothesis that the statute of limitations will run against a mining claim, before patent issues, as against other forms of realty, which renders it unnecessary that we examine the question presented whether the statute will run while the title is in the United States. We therefore pass no opinion upon it.

[5] So of the defense of estoppel. The showing made does not establish that the defendants expended any considerable amount of money on the premises with the knowledge and assent of plaintiff.

As it pertains to the estoppel by decree, we need only remark that the case in which the decree was had was between different parties from those litigating in the present cause, and the present parties are in no legal way in privity with them.

Laches, as such, on the part of the plaintiff does not appear to have been pleaded as a defense.

Assignment of error No. 33 involves the question whether Tom D. Jensen should have been permitted to testify that he had or claimed an interest in Bench No. 1. This is rendered immaterial by the fact that counsel conceded that the plaintiff had succeeded to the title of Jensen in the claim.

It is also immaterial whether plaintiff tried to buy whatever interest McCumber claimed in the premises prior to the trial. Whatever effort was made in that direction was probably in the way of a compromise. Error No. 50 is therefore not well assigned.

Errors Nos. 6, 7, and 8 are without merit. As to No. 11, what Spanggard told Gibson was not hearsay, as Gibson was seeking information as to the location of the corner stakes for the purpose of making a survey, and this was one of his sources of information. There was no effort to introduce what Spanggard said as testimony in the case. Such assignment is therefore not well taken.

We have also examined assignments of error Nos. 16, 17, 31, and 32, and find them without merit. It may be said in this connection that, where the assignments are based on the court's rejecting certain offers of proof, counsel stated what was intended to be proved by such testimony. If the proofs had been admitted as so stated, they would not have altered our conclusion.

[6] This leaves but one other question, which is predicated upon the court's refusal to assign the cause for trial before another judge. The motion for such assignment is based upon the affidavit of McCumber, to the effect that he—

"believes that the said judge of the above-entitled court is biased, through friendship, in favor of the plaintiff, Pioneer Mining Company, and is prejudiced and biased against the defendants, and that by reason of said bias and prejudice the said judge refused to grant the defendants a jury trial on the issues of fact prayed for, and also refused to grant a continuance of the trial of said action for a reasonable time to enable the defendants to prepare for trial, as prayed for by the defendants; that affiant believes that defendants cannot have a fair and impartial trial before the present judge of this court by reason of the said prejudice and bias above alleged, and alleges that the said judge is disqualified from acting as trial judge in said cause by reason thereof."

Elwood Bruner, an attorney for defendants, also made an affidavit in support of the motion, but in no way does he assert that the judge is biased or prejudiced. Properly analyzed, McCumber's statement is a mere assertion of his belief, giving no reasons in its support. The showing made does not disqualify the judge, under the provisions of sections 707 and 708 of the Alaska Code.

Further than this, the assignment for trial before another judge meant a delay of six months or more, and, it being fully apparent that substantial justice has been done, the cause should not be reversed on the ground involved by the assignment of error.

These considerations lead to an affirmance of the decree of the trial court; and it is so ordered, with costs to the appellee.