ELY REAL ESTATE & INVESTMENT CO. v. WATTS et al.*

(Circuit Court of Appeals, Ninth Circuit.   February 2, 1920.)

No. 3332.

1. PUBLIC LANDS ☞223(6)—RECOGNITION BY TREATY OF MEXICAN GRANT.

The owner of a Mexican grant, perfected before the cession by the Gadsden Treaty, was permitted, but not required, by Act July 22, 1854, to assert his claim and have the land reserved thereunder and the fact that he did not do so in no way affects his title, which by the treaty the United States bound itself to recognize and protect.

2. PUBLIC LANDS ☞220—PERSONS CONCLUDED BY JUDGMENT OF COURT OF PRIVATE LAND CLAIMS.

A judgment of the Court of Private Land Claims, created by Act March 3, 1891, in a suit by the United States, sustaining the validity of a Mexican grant within the territory ceded by the Gadsden Treaty as having been perfected prior to the cession, is conclusive, not only as against the United States, but as against any grantee of the United States.

Appeal from the District Court of the United States for the District of Arizona; William H. Sawtelle, Judge.

Suit in equity by Cornelius C. Watts and Dabney C. T. Davis, Jr., against the Ely Real Estate & Investment Company. From a decree for complainants (254 Fed. 862), defendant appeals. Reversed.

Selim M. Franklin, of Tucson, Ariz., for appellant.
Kingan & Campbell, of Tucson, Ariz., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge.   In June, 1860, Congress passed an act (12 Stat. 71, c. 167), granting to the heirs of Luis Maria Cabeza de Baca the right to select lands in the public domain in lieu of the Las Vegas grant, which they claimed to own.   The act provided that the heirs of Baca might select "an equal quantity of vacant land, not mineral," in the territory of New Mexico, to be located by them in square bodies not exceeding five in number.   In 1863 the Baca heirs made selection of the tract now known as "Baca Float No. 3."   In 1864 the Commissioner of the General Land Office approved the selection and ordered a survey, and in 1906 the tract was surveyed. In December, 1914, the field notes of the survey were approved by the Secretary of the Interior.   Within the boundaries of Baca Float No. 3 is a tract of land known as the "Sonoita Grant," granted in 1824 by the Mexican government to Leon Herreros.   The appellees, the owners of Baca Float No. 3, brought suit in the court below against the appellant, the owner of the Sonoita Grant, to quiet title to the whole of Baca Float No. 3.   Upon the final hearing decree was entered in favor of the appellees, as prayed for in their bill of complaint, and it was adjudged that the appellant be barred from asserting any right, title, or interest in the land included within the boundaries of Baca Float No. 3.

[1] The Gadsden Treaty with Mexico of December 30, 1853 (10 Stat. 1031), under which the United States acquired that portion of Arizona in which the land here in controversy lies, declared in article

5 that all the provisions of the eighth and ninth articles of the Treaty of Guadalupe Hidalgo (9 Stat. 929, 930) should apply to the ceded land. Those articles provide that the property of Mexicans within the territory ceded "shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States," and "shall be maintained and protected in the free enjoyment of their liberty and property," etc. It is not disputed that at the time of the treaty the land in the Sonoita Grant was private property, and that the grant was a perfected grant, whereby the absolute title to the land had passed out of the republic of Mexico and into Herreros, the grantee.

The court below dealt with the claim of the appellant as dependent, not only upon the terms of the treaty, but also upon the provisions of the Act of July 22, 1854, 10 Stat. 308, and held that inasmuch as no steps were taken by the appellant's predecessors in interest to secure under that act the reservation of the land from entry and sale, Congress had the right to regard the Sonoita Grant as forfeited, and to dispose of the land as it saw fit, and that it did so dispose of it by the grant to the Baca heirs of June 21, 1860, which grant, in the opinion of the court, effected a repeal pro tanto of the reservation of the act of 1854. This position is tenable only on the assumption that in order to protect the Sonoita Grant it was necessary for the owner to assert his claim thereto under the Act of July 22, 1854, and thereby effect a reservation of the granted land from disposition or sale by the United States. The Act of July 22, 1854, made it the duty of the Surveyor General of New Mexico to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico, and for that purpose it gave him power to issue notices, summon witnesses, administer oaths, etc., and required him to make a full report of all such claims as originated before the cession of the territory to the United States by the Treaty of Guadalupe Hidalgo, denoting the various grades of title, with his decision as to the validity or invalidity of each, and provided that on presentation of his report to Congress all lands covered by such claims should be reserved from sale or other disposal by the government.

There is in the act no expression of the intention of Congress that a Mexican grant to land in the ceded territory should be impaired or affected by the failure of the Surveyor General to investigate the same or report thereon, or the failure of the claimant to present the same for investigation. In that respect the act differs materially from the Act of March 3, 1851, 9 Stat. 631, for the settlement of private land claims in the state of California, which provided that all claimants of land under a Spanish or Mexican grant should present the same to commissioners to be appointed, and declared that—

"All lands the claims to which shall not have been presented to the said commissioners within two years after the date of this act shall be deemed, held, and considered as part of the public domain of the United States." Section 13.

That act provided a special tribunal to settle all questions of title and location. There were afforded three, and at one time four, op-

portunities for a hearing: First, before the Board of Land Commissioners, then successive appeals to the District, Circuit, and Supreme Courts of the United States, in all of which, except the last, the parties were entitled to introduce further evidence. The act of 1854 imposed no obligation upon the claimants of Mexican grants to present the same for investigation and adjudication, as did the act of 1851, nor did it create a commission to adjudicate the validity of such claims, as did the act of 1851, and we cannot think that under the act of 1854 the failure of the Surveyor General to investigate or report the claim of a Mexican grant worked a forfeiture of such a claim or rendered the land subject to disposal by the United States. No reported case so holds. On the contrary, the Supreme Court has in several decisions, either in terms or by implication, held that under the Gadsden Treaty the owner of a perfect grant from the Mexican government is entitled to protection, irrespective of any provision of the Act of July 22, 1854. In Ely's Adm'r, v. United States, 171 U. S. 220, 239, 18 Sup. Ct. 840, 848 (43 L. Ed. 142), the court said:

"This government promised to inviolably respect the property of Mexicans. That means the property as it then was, and does not imply any addition to it. The cession did not increase rights. That which was beyond challenge before remained so after."

And, speaking of the Sonoita Grant (171 U. S. 234, 18 Sup. Ct. 846, 43 L. Ed. 142), the court said:

"These considerations lead us to the conclusion that this grant was one which, at the time of the cession in 1853, was recognized by the government of Mexico as valid, and therefore one which it was the duty of this government to respect and enforce."

In Ainsa v. New Mexico & Arizona Railroad, 175 U. S. 76, 20 Sup. Ct. 28, 44 L. Ed. 78, the court, after adverting to grants of land in prior cessions of territory to the United States, said:

"Even grants which were complete at the time of the cession may be required by Congress to have their genuineness and their extent established by proceedings in a particular manner before they can be held to be valid. But, where no such proceedings are expressly required by Congress, the recognition of grants of this class in the treaty itself is sufficient to give them full effect. * * * The effect of these provisions of the act of 1891 is that all prior acts of Congress providing for the assertion, whether in a judicial tribunal or before a surveyor general and Congress, of either complete or incomplete Mexican grants, are repealed, except as to claims previously acted upon and decided by Congress or under its authority; that all incomplete claims against the United States, coming within the provisions of the act, must be presented to the Court of Private Land Claims; that any one claiming land under a Mexican grant, which was complete and perfect at the time of the cession of sovereignty, 'shall have the right (but shall not be bound) to apply to said court,' as in cases of incomplete grants. * * * The result is that the United States, by the act of 1891, have prescribed and defined the only method by which grants incomplete before the cession can be completed and made binding upon the United States, but have neither made it obligatory upon the owner of a title complete and perfect before the cession to resort to this method, nor declared that his title shall not be valid if he does not do so. A grant of land in New Mexico, which was complete and perfect before the cession of New Mexico to the United States, is in the same position as was a like grant in Louisiana or in Florida, and is not in the position of one under the

peculiar acts of Congress in relation to California, and may be asserted, as against any adverse private claimant, in the ordinary courts of justice."

In Richardson v. Ainsa, 218 U. S. 289, 31 Sup. Ct. 23, 54 L. Ed. 1044, the court held that under the Gadsden Treaty the good faith of the United States was pledged to respect Mexican titles, and that one whose title was absolutely perfected prior to the treaty was not bound to present his title to the Court of Private Land Claims for confirmation under the Act of March 3, 1891. In that case, which was a suit to quiet title brought in 1887, the appellee therein claimed under the Sonoita Grant, and the appellant claimed through patents issued by the United States in 1879 and 1880 under the Homestead Laws (12 Stat. 392, c. 75). The court held that the patents were void, for the reason that the lands conveyed thereby, whether reserved or not by the Acts of July 22, 1854, c. 103, § 8, 10 Stat. 308, and July 15, 1870, c. 292, 16 Stat. 304, were not public lands, but private property, "which the government was bound by the express terms of the Gadsden Treaty of December 30, 1853, to respect." Referring to sections 6 and 8 of the Act of March 3, 1891, the court said:

"After providing in section 6 for incomplete titles, the act goes on in section 8 to deal with complete ones. Holders of claims under such titles, it says, 'shall have the right (but shall not be bound) to apply to said court' for a confirmation of their title. Of course this means that the title is recognized as good without the proceeding in court."

We are unable to distinguish the Richardson Case in principle from the case at bar. If it was unnecessary for the protection of the Sonoita Grant that proceedings should be taken to reserve it against homestead settlement and patents, it was unnecessary that such proceedings be taken to protect it against the grant to the Baca heirs. If the United States could not grant the Sonoita land to homestead settlers, it could not grant it to the Baca heirs. We think it was error, therefore, to hold that the right of the claimant of the Sonoita Grant was lost by the failure to secure a reservation of the same prior to the grant to the Baca heirs, and that it was error to adjudge the title to be in the appellees.

[2] We are of the opinion, moreover, that the appellees are estopped by judgment to assert title as against the appellant. The appellant, in its answer to the bill of complaint, alleged that on October 19, 1892, the United States filed in the United States Court of Private Land Claims under the Act of March 3, 1891, its petition against the predecessors in interest of the appellant to obtain a decree that the claim of the defendants therein to title be adjudged invalid and void, and that upon the issues therein the defendants claiming under the grant to Leon Herreros, a final judgment and decree was entered on August 6, 1902, in favor of the predecessors in interest of the appellant and against the United States, adjudging that the Sonoita Grant constituted a valid title from the Mexican government, which was complete and perfect at the date of the acquisition of the territory by the United States, and that said decree has not in any respect been vacated or modified. The court below held that the decree was not

res adjudicata between the parties hereto, and did not estop the appellees to litigate the question of title here involved. The Act of March 3, 1891, 26 Stat. 851, 857, provides that the decree in a proceeding to confirm title in the Court of Private Land Claims shall not affect any conflicting private interests, rights, or claims held adversely to any such claim or title, and that no confirmation of claims or titles under the act shall have any effect other or further than as a release of all claim of title by the United States, and that no private right of any person as between himself and other claimants or persons in respect of any such lands shall be in any manner affected thereby. A similar provision is found in section 15 of the Act of March 3, 1851, 9 Stat. 631. In Beard v. Federy, 3 Wall. 478, 492, 18 L. Ed. 88, concerning the effect of proceedings under the latter act, the court said:

"As against the government this record, so long as it remains unvacated, is conclusive. And it is equally conclusive against parties claiming under the government by title subsequent. * * * The term 'third persons,' as there used, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property."

In Dominguez de Guyer v. Banning, 167 U. S. 723, 741, 17 Sup. Ct. 937, 943 (42 L. Ed. 340) the court reaffirmed the conclusiveness of the record as against "parties claiming under the government by title subsequent." In Jones v. St. Louis Land Co., 232 U. S. 355, 34 Sup. Ct. 419, 58 L. Ed. 636, the court cited Beard v. Federy and said:

"It may be said of such direct confirmation by act of Congress, as has been said of confirmation through special tribunals created by Congress, that it constitutes a declaration of the validity of the claim under the Mexican laws and that the claim is entitled to recognition and protection by the stipulations of the treaty."

In Interstate Land Co. v. Maxwell Land Co., 139 U. S. 569, 580, 11 Sup. Ct. 656, 660 (35 L. Ed. 278), the court, speaking of the effect of proceedings to confirm title under the Act of March 3, 1851, and the patents from the United States issued in pursuance thereof, observed:

"The confirmation and patenting of the grant * * * operated to divest the United States of all their rights to the land embraced in the grant which this country acquired from Mexico by the Treaty of Guadalupe Hidalgo; and the only way that that grant can be defeated now is to show that the lands embraced in it had been previously granted by the Mexican government to some other person."

In Teschemacher v. Thompson, 18 Cal. 11, 26, 79 Am. Dec. 151, the Supreme Court of California, in an opinion by Chief Justice Field, after referring to the solemn record of the government of its action and judgment with respect to the title of a claimant existing at the date of the cession, said that the government itself—

"cannot question its verity, nor can parties claiming through the government by title subsequent. * * * But as the record of the government of the existence and validity of the grant it establishes the title of the patentees from the date of the grant."

Again the court said:

"The 'third persons' against whose interest the action of the government and patent are not conclusive under the fifteenth section of the Act of March 3, 1851, are those whose title accrued before the duty of the government and its rights under the treaty attached."

In Carpentier v. Montgomery, 13 Wall. 480, 495 (20 L. Ed. 698), the court said that the fifteenth section of the act—

"was intended to save the rights of third persons, not parties to the proceeding, who might have Spanish or Mexican claims independent of or superior to that presented by the claimant, or the equitable rights of other parties having rightful claims under the title confirmed."

It has been held in numerous decisions that the patent issued upon a confirmed Mexican grant is to be regarded in two aspects: First, it is a quitclaim deed from the United States, which takes effect by relation at the time when proceedings were instituted by the filing of the petition with the commission or court created to adjudicate the claim; second, it is a record of the government, showing its judgment with respect to the title of the patentee at the date of the cession. Leese v. Clark, 20 Cal. 388; Beard v. Federy, 3 Wall. 478, 18 L. Ed. 88; Bissell v. Henshaw, 1 Sawy. 553, 565, Fed. Cas. No. 1,447, affirmed in Henshaw v. Bissell, 18 Wall. 255, 21 L. Ed. 835. In Los Angeles Milling Co. v. Los Angeles, 217 U. S. 217, 227, 30 Sup. Ct. 452, 456 (54 L. Ed. 736), it was said that the action of the tribunals established to pass upon the validity of such grants is—

"an admission that the rightful ownership had never been in the United States, but had passed at the time of the cession to the claimant, or to those under whom he claimed."

The reasons for these rulings are aptly expressed by Chief Justice Field in Leese v. Clark, 20 Cal. 388, 423:

"As against the government, this record, so long as it remains unvacated, is conclusive; as against the government it imports absolute verity; and it is equally conclusive against parties claiming under the government by title acquired subsequent to the time, at which the obligation of the government attached; otherwise, the power of the government to enforce the stipulations of the treaty, and the obligation imposed by the law of nations, would be limited and dependent, and not, as they are, sovereign and supreme. And it is in this effect of the patent as a record of the government that its security and protection chiefly lie. If parties asserting interests in lands acquired since the acquisition of the country, could deny and controvert this record and compel the patentee in every suit for the recovery of his land to establish the validity of the grant, his right to a confirmation of his claim thereunder, and the correctness of the action of the officers of the government in the survey and location of the grant, the patent, instead of being an instrument of quiet and security to the possessor, would become a source of perpetual and ruinous litigation."

The decree is reversed, and the cause is remanded to the court below, with instructions to enter a decree in favor of the appellant, quieting its title to the land described in the patent which issued to it from the United States of date October 29, 1906, in pursuance of the decree of the Court of Private Land Claims hereinbefore mentioned.