**W. A. CARLEY, Plaintiff in Error,**

**v.**

**C. E. DAVIS, Nora V. Davis, Terry Miller, Evelyn Miller, and the Prudential Life Insurance Company of America, a Corporation, Defendants in Error.**

**No. 41873.**

Supreme Court of Oklahoma.

April 1, 1969.

As Amended April 18, 1969.

Hal Welch, Hugo, for plaintiff in error.

Joe Stamper, Jerry Otis, Antlers, for defendants in error.

BLACKBIRD, Justice.

This appeal arose out of an action by plaintiff in error, hereinafter referred to as "plaintiff", to quiet his alleged title to a strip of land containing approximately 15 acres and shaped rather like a right angle triangle, east of Horse Creek and west of the eastern boundary of the W½ SW¼ NE¼ of Section 1, Township 8 South, Range 17 East in Choctaw County, Oklahoma.

Horse Creek empties into Red River, after diagonally traversing said 20-acre tract in a southerly and southeasterly direction. The Creek's channel has, in recent years, turned almost due east, practically coinciding, at some points, with the southern boundary of this tract before merging with said River's channel. There is testimony in this case indicating that, formerly, this creek flowed in a straighter southerly direction and traversed a part of the SE¼ of the same section, designated as said section's "Lot 2", before meeting the River's channel.

A short time before this triangular strip of land attracted his attention, in so far as the record shows, plaintiff, who resided in another part of Choctaw County, had acquired said section's SE¼ and its NE¼ SW¼, NE¼, then known as the "Wilkins Charley land", and said section's SE¼ SW¼ NE¼, then known as the "Wilkins land". Plaintiff then went to the Liberty National Bank of Paris, Texas, and, by contacting said Bank's President, Mr. J. M. Cecil, now deceased, acquired a warranty deed from said bank to land described in

said deed as follows: "All that land lying and being situated E of Horse Creek located in Lots 1 and 2 of Section 1, Township 8 S, Range, 17 East of the Indian base and meridian containing approximately 12 acres. Being out of that portion of lands described in deed recorded in Book 181, page 360, Choctaw County Records. * * *."

Without obtaining an abstract of title, having the county conveyance records checked, or having a survey made of the land described in his deed as above shown, plaintiff had his deed recorded, and later, after his brother had sold the 80-acre tract adjoining plaintiff's 60 acres of Nellie Charley and Wilkins land on the north, to a Mr. Mattlock, plaintiff, in 1944, built a fence between his said 60 acres, and Mattlock's land, that extended due west of the 60 acres' northwest corner until it reached, and was connected to, a tree on Horse Creek's eastern bank.

Thereafter, in the Fall of 1946, plaintiff left Choctaw County and moved to Texas, where he farmed 146 acres in the vicinity of Plainview, until sometime in 1957. In 1960 he moved from there to Paris, Texas.

In the meantime, Mr. and Mrs. J. H. O'Keefe acquired the Choctaw County land traversed by Horse Creek west of plaintiff's 60 acres by a deed dated October 30, 1951, from its then owners, a Mr. and Mrs. Blount, describing the land therein conveyed (among other land not involved in this action) as follows: "The W½ of SW¼ of NE¼ * * * all in Section 1, Township 8 South, Range 17 East, of the Indian Base and Meridian * * *."

Thereafter, in April, 1952, the O'Keefes sold the above described land to the defendant in error, Terry Miller, who thereafter owned it until selling it to the defendant in error, C. E. Davis, early in 1964.

Shortly thereafter, when plaintiff discovered flagged stobs, driven into the ground on the triangular strip of land in controversy by the Choctaw County Surveyor, Clarence Reeder, who had been engaged by Davis to survey the tract he had purchased, as aforesaid, plaintiff then ascertained from a workman on the Davis farm what was being done, procured from him Davis' name and address and contacted him at his Paris home, where he learned that Davis claimed that said strip was included in his aforementioned purchase. The two then agreed to meet later at the Choctaw County Court House. At this meeting, where the surveyor, Mr. Reeder, talked to plaintiff and Davis, and they caused the county conveyance, and ad valorem tax, records to be examined, plaintiff learned that his deed from the Paris bank did not cover the triangular strip.

Thereafter, when Davis and his workman, Sexton, went upon this strip to erect a fence along its eastern boundary, as established by the aforesaid survey, plaintiff told them to desist and remove themselves from the property until he could see his attorney, who was then out of town, and together they could decide what to do.

Thereafter, plaintiff instituted the present action on the theory that he had acquired prescriptive title to said strip of land by having been in adverse possession of it for more than twenty years.

Davis, and other defendants in error, hereinafter collectively referred to as "defendants", filed an answer to plaintiff's petition in which they alleged, among other things in substance, that if plaintiff had been in possession of the subject tract at all, this had been for too short a period to acquire title by prescription.

At the trial, plaintiff testified that when he obtained his aforedescribed deed from the Paris bank in 1943, he thought the strip of land in controversy was in Section One's Lot 2; but he admitted that he had never investigated this until the present controversy arose. He further testified that he had never lived on the tract, that there were no houses on it, that he had paid taxes on the basis of the description in his deed, and he admitted that his payments had been made on the wrong land— land that is now in the Red River's channel south of such strip.

There was testimony from the plaintiff, and other witnesses, that at the same time he constructed the aforementioned fence from the northwest corner of his Nellie Charley tract to Horse Creek, in 1944, plaintiff also took down the fence that had previously stood on the western boundary of that tract and used parts of it to construct a fence along the east bank of said Creek, so that the subject tract was then enclosed with his Nellie Charley and Wilkins tracts.

It also appeared from the evidence that after plaintiff thought he had purchased the subject tract, he grafted paper shell pecan sprouts to the native pecan trees on it, and after a few years converted the tract into a pecan grove. There appears to be little, if any question from the testimony of the various witnesses that, from the time plaintiff obtained his deed from the Paris bank, in 1943, up to, and including, the year 1950, he had exclusive possession of, and exercised exclusive dominion over, the strip of land in question.

After 1950, during which a Mr. Bowers leased the tract from plaintiff, without a recorded lease, the issue appears to be somewhat in doubt. Bowers, who testified that he had lived in that vicinity all of his life, further testified that he leased the strip in question, along with all of plaintiff's land east of it, for that year, and that he then grew popcorn on about twenty acres of it and pastured about 20 cattle on the rest. Though Bowers testified he moved some of plaintiff's fencing to inclose some of the crop land, it does not appear clear from his testimony (by comparison of his direct examination with his cross examination) whether he removed the fence along Horse Creek to do this, whether plaintiff had already removed it, or whether the witness used some of the fencing around the plaintiff's Nellie Charley land to make this enclosure. It is undisputed, however, that there was no fence along the east side of the creek after 1950.

Although plaintiff testified, during part of his re-direct examination, that there had never been a year since 1944, that he didn't have possession of such tract by himself, or through a tenant, the years 1947, 1950 and 1957, are the only ones—after he left Choctaw County, in 1946—that he mentioned having made trips to it, leased it, or done any specific work upon it.

Mr. Bowers testified that he didn't know of the land having been leased after he had it in 1950, but he further testified that he had gathered pecans there during two Falls since, and that plaintiff had paid him for this work. Plaintiff testified that he was on the land only three times, or less, during the period of O'Keefes ownership (5 months in late 1951 and early 1952) and that, in the Summer of 1952, he cleared the strip of underbrush, disked the soil around the pecan trees, let the tract grow up in clover during the Winter, and quit renting it out for pasture during the Summer.

Terry Miller testified that he had possession of the strip after he purchased it from the O'Keefes in 1952, and his testimony that he had cattle on it "one summer" was corroborated by other witnesses. He further testified that he never saw plaintiff on the land and had never heard of him, or his claimed ownership, until this controversy arose. His testimony that he had pumped Horse Creek dry for irrigation, which plaintiff testified he saw him do on one occasion, and his testimony as to how the Creek could be crossed to go from this land west of it, to the tract in controversy, tended to contradict testimony adduced by plaintiff tending to make it appear incredible that, because of the Creek's high banks, cattle could migrate from the land on its west bank to the subject land on its east bank. Miller further testified that after the Creek overflowed in 1957 and 1958, he put it in the Soil Bank in 1958, and that the government paid him rent on it five years.

After much other testimony pertaining to the various facets of the controversy and the introduction of some documentary evidence unnecessary to describe, the court rendered his general judgment for the de-

fendants. After the overruling of his motion for a new trial, plaintiff lodged the present appeal.

Although plaintiff has filed an elaborate brief contemplated to show that he had the various legal requirements for prescriptive title to the subject tract, without the necessity of a deed properly describing it, and without paying taxes on it, in our opinion, there are only three subdivisions of his argument that are pertinent to the crucial issue in this case, and need to be dealt with.

In two of these subdivisions (PROPOSITION 2 and 2F) plaintiff contends, in substance, that all of the evidence conclusively shows his continuous, uninterrupted, and adverse possession of the subject land from the Spring of 1944 until after defendant Davis acquired his deed to it, in 1964, and that the trial court's judgment, to the contrary, is against the clear weight of the evidence. In support of this, plaintiff asserts (as his PROPOSITION 2C) that: "Neither a casual entry upon a pecan grove and 'picking up' pecans, nor the 'straying' of cattle upon * * * (it) in isolated instances, is sufficient to break the continuity of adverse possession."

■ In our opinion these arguments contain assumptions of fact that are not impelled by the evidence. Terry Miller testified that his land was his continual place of work until he put it in the Soil Bank; and, instead of stating that his cattle merely "strayed" over onto it, he testified, as hereinbefore indicated, that he had them over there all "one summer". Though this witness did not specify what summer he had reference to, from his testimony it must be reasonably concluded that this was one of the years before 1958, when he put all of his land in the Soil Bank. After carefully reviewing the evidence, we cannot say that a determination that plaintiff's claimed "exclusive" possession of the strip in question was shared with him by others, before expiration of fifteen years from the date he went into its possession, would be clearly against the weight of the evidence.

■ Plaintiff, the party who relied upon adverse possession for his claimed title, had the burden of proving all of the necessary facts to establish such title. The trial court was justified in indulging every presumption in favor of the so-called "true", or record, owner, who in this case was the defendant Davis. See Collins v. Smith, Okl., 372 P.2d 878, 881, and cases there cited. As said in Diem v. Diem, Okl., 372 P. 2d 19, 23: "As hereinbefore shown, there was testimony reasonably supporting the conclusion that before the fifteenth anniversary of the commencement of plaintiff's possession and use of the plot of ground involved, it lost its exclusive character and became, and remained thereafter * * * mixed, or shared, possession and use. That character of possession is not sufficient for prescriptive title purposes (citing authorities)." The case of Bonebrake v. Flourney, 133 Okl. 101, 271 P. 658 (cited by plaintiff) in which the unauthorized entry of Rodiquez, an intruder—not a record owner—and his secret payment of rent to the plaintiff in that case, was held not to constitute a re-entry by said plaintiff into possession of the property, is not in point here.

In accord with the foregoing, the judgment of the trial court is hereby affirmed.

IRWIN, C. J., and BERRY, V. C. J., and DAVISON, WILLIAMS, JACKSON, HODGES and LAVENDER, JJ., concur.

McINERNEY, J., concurs in result.