**William SHILTS, Appellant and Cross-Appellee,**

v.

**Robert Gould YOUNG, Appellee and Cross-Appellant.**

**Nos. 3003, 3102.**

Supreme Court of Alaska.

July 22, 1977.

---

Charles E. Tulin, Anchorage, for appellant and cross-appellee.

Edward G. King, Ziegler, Ziegler & Cloudy, Ketchikan, for appellee and cross-appellant.

Before BOOCHEVER, C. J., RABINOWITZ, CONNOR and BURKE, JJ., and DIMOND, J. Pro. Tem.

## OPINION

BOOCHEVER, Chief Justice.

This appeal presents issues concerning adverse possession and the validity of a deed. Robert Young brought a quiet title suit claiming title to all eighty acres of

United States Survey 691 located on Prince of Wales Island by adverse possession and under claim and color of title. William Shilts counter-claimed contending that he has record title to 240,000 square feet of the property and that Robert Young has not established title by adverse possession. The trial court found in favor of Mr. Young. Mr. Shilts has appealed, and Young has cross-appealed from the failure of the trial court to award him attorney's fees.[1] We have concluded that the court erred in holding that adverse possession had been established as to the 240,000 square feet of property in dispute, and this case must be reversed and remanded as set forth below.

## FACTS

In 1908, the Alaska Industrial Company received patent to U. S. Survey No. 691. The survey consists of approximately eighty acres of semi-wilderness area located on Prince of Wales Island. Once the townsite of Sulzer, the headquarters for copper mining activity in the region, the area is now abandoned. It is accessible only by boat or plane.

Shilts bases his claim to 240,000 square feet of this eighty-acre parcel on a recorded 1909 deed from Alaska Industrial Company to Aaron Shellhouse, and on his alleged status as Shellhouse's sole legal heir. The 1909 deed conveys six blocks of land within Survey 691. The six numbered blocks, each 200 feet square, are located by reference to named streets and were "more particularly described on Survey No. 691, made by Chas. S. Hubbell, . . . ." The Hubbell survey, however, has not been found, and the plat admitted into evidence at trial shows no lot or street designations. None of the parties or witnesses was able to recall the existence or location of streets in Sulzer.

William Shilts is the grandson and sole heir of Aaron Shellhouse. Shilts testified that he moved to Sulzer in 1923 when he was five years old. He stated that at that time, there were four buildings on the land

in the claimed area, that a garden had been planted and land cleared. Additionally, Shilts testified that his uncle had been buried on land underneath a boathouse.

The testimony of several witnesses and a report on the homestead by the United States Land Office in 1906 confirm the fact that Shellhouse had made improvements on the property. The locations of these improvements were indicated by the witnesses' placing marks on a 1905 plat of U. S. S. 691.[2]

Shilts left Sulzer in 1931 and, prior to the commencement of this litigation, had never returned. He neither paid taxes on the property nor secured water rights. Prior to the litigation, he had not filed a statement of property interest with the state, although he did so after this suit was filed.

Judge Schulz, in his helpfully complete memorandum decision, stated:

Without the Hubbell plat, it is difficult to determine the layout of the lots conveyed to Shellhouse and impossible to determine the width, location and direction of the various roads and ways which formed the boundaries. However, the only way that I can reconcile the description in the deed places lots 1 and 4 on the beach with lots 2 and 3 immediately behind, lot 5 adjacent to lot 3 and lot 6 immediately behind lot 5. The configuration is as follows:

The above configuration is inconsistent with Mr. Shilts' testimony. He testified that the property conveyed to Shellhouse all lay along the beach. If that were

1. The attorney's fee issue has not been briefed on appeal and is considered as abandoned.

2. It is not clear, however, that all the buildings then located in the area of those marks were owned by Shellhouse.

true, the Deed description would be entirely meaningless.

The above configuration is also consistent with the location of the improvements discussed above.

I find that the land conveyed by the deed of November 15, 1909 is situated between Corner No. 1 and Point No. 2 on defendants' Exhibit B and consists of approximately 400 feet of beach frontage, as in the above configuration.[3]

In 1950, Robert Young received a quitclaim deed to:

> The land embraced within the exterior boundaries of U. S. Survey 691, being containing approximately eighty (80) acres.

from his grandmother Bertie Gould, the wife of H. R. Gould, and her three children, in consideration of one dollar.[4] This deed was recorded. Like the Shellhouses, the Goulds had been residents of Sulzer during the days of the copper mining boom. Young does not contend that he has a valid record title from the quitclaim deed, and no claim of title from patent to him has been established.

Since 1950, Young has flown over the property between ten and fifty times a year. Most of these flights were made in connection with his business as a pilot,[5] but during each flight in the area, he has "made a point" of flying over the land, "keeping an eye on it." At least once a year, he has landed on the island and, following the plat, he has walked what he considered to be the boundaries of the land about a half dozen times. Young stated that he had never

seen anyone on the property and had never asked anyone to leave, although he had observed indications of the presence of some bottle collectors. He has never fenced the boundaries of the land, made any improvements or posted signs on the land indicating his ownership or warning trespassers.

Territorial taxes on the property were assessed to and paid by Young's grandparents at least twice in 1949 and 1950.[6] Young stated that a third assessment had also been paid. In 1958 and again in 1967, Young apparently prevented the state from foreclosing on the property. A statement of real property ownership was filed in 1967, and in 1971, Young filed for water rights on the property as required by the state. A certificate of water appropriation was recorded in 1972.

Residents of Hydaburg,[7] familiar with the property and the Shellhouse family, recognized that the Shellhouses had had an interest in the property. However, based on family discussion, Young had been led to believe he owned the entire tract, and he always claimed it as his own. Testimony at trial indicated that the residents of Ketchikan also believed that Young was the owner of the entire eighty-acre parcel, and he had once been approached by a logging company regarding purchase.

## THE SHELLHOUSE DEED

■ Unoccupied land is presumed to be in the constructive possession of the true owner or the party with better title.[8] Since

---

3. This portion of the decision is repeated in the formal findings of fact numbered XII, XIII and XIV.

4. H. R. Gould was deeded a portion of the U. S. Survey by his father, J. L. Gould. Alaska Industrial Company had conveyed Blocks 7 and 8 of the Hubbell survey to J. L. Gould in 1910, and Gould conveyed the western half of this portion to his son later in that year.

5. Since 1969, Young has been the owner of Ketchikan Transport Company, a marine transportation concern. He owned Tensco Helicopters for approximately seven years from 1958.

6. A territorial tax on property was authorized by Chapter 10, SLA 1949 but was repealed by Chapter 22, SLA 1953.

7. Hydaburg is located on Prince of Wales Island, unconnected by road across a mountainous peninsula approximately fifteen miles from the former townsite of Sulzer.

8. *Toby v. Portlock Harbor Copper Mining Co.,* 6 Alaska 51, 52 (1918); *Pacific Coal & Transp. Co. v. Pioneer Mining Co.,* 205 F. 577, 4 Alaska 115, 134 (9th Cir. 1913); *Tyee Consolidated Mining Co. v. Langstedt,* 121 F. 709, 2 Alaska 53, 57 (9th Cir. 1903); 5 Thompson on Real

entry is presumptively with permission of the owner, the burden rests on the party claiming title by adverse possession to show a distinct and positive assertion of a right hostile to the owner.[9] Thus, if the deed from Alaska Industrial to Shellhouse is valid, Young was required to prove the elements of adverse possession under either AS 09.10.030[10] or AS 09.25.050,[11] by showing open, notorious, continuous, exclusive and hostile possession.[12]

■■■ A valid deed must designate the land intended to be conveyed with reasonable certainty. However, " . . . [t]he purpose of a deed description is not to identify the land, but to furnish the means of identification."[13] Thus, a description is sufficient if it contains information permit-

ting identification of the property to the exclusion of all others.[14]

■■■ Older cases suggest that where the terms of the grant or deed leave the identity of the real property completely uncertain, the deed is void.[15] The general rule, however, is that where possible, deeds will be made operative and the intentions of the parties given effect. A deed is not void for uncertainty of description if the quantity, identity or boundaries of the property can be determined by reference to extrinsic evidence.[16] Such evidence may include parole and subsequent conduct of the parties as well as other documents.[17] There appear to be few restrictions on the use of extrinsic evidence in ambiguous or uncertain deed

Property § 2545 p. 534 n. 52 (1957 Replacement).

9. *Hamerly v. Denton*, 359 P.2d 121, 126 (Alaska 1961).

10. AS 09.10.030 states:
    *Actions to recover real property in 10 years.* No person may bring an action for the recovery of real property, or for the recovery of the possession of it unless commenced within 10 years. No action may be maintained for the recovery unless it appears that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of the premises in question within 10 years before the commencement of this action.

11. AS 09.25.050 states:
    *Conclusive evidence of adverse possession.* The uninterrupted adverse notorious possession of real property under color and claim of title for seven years or more is conclusively presumed to give title to the property except as against the state or the United States.

12. *See generally* 5 Thompson on Real Property § 2543 pp. 523–26 (1957 Replacement).

13. *Matney v. Cedar Land Farms, Inc.*, 216 Va. 932, 224 S.E.2d 162, 165 (1976).

14. 6 Thompson on Real Property § 3021 pp. 441, 444 (1962 Replacement).

15. *See Carpentier v. Montgomery*, 80 U.S. (13 Wall.) 480, 20 L.Ed. 698, 701 (1872).

16. According to Thompson:
    A deed will not be declared void for uncertainty if it is possible, by any reasonable rules of construction, to ascertain from the description, aided by extrinsic evidence, what property it was intended to convey. The description need not be by government sur-vey, lots and blocks, or metes and bounds if it still is sufficient to permit the property to be located definitely. It may be general and need not be by boundaries, corners, distances, or monuments if only, with the aid of parol evidence, the location of the land is possible. "The law will not declare the instrument void for uncertainty until it has been examined with all the light which contemporaneous facts may furnish. If these render the intention clear and the words of the instrument are, by fair rendering, susceptible of a construction to uphold such intention, then they will be so construed and the instrument enforced." It is only when it remains a matter of conjecture what property was intended to be conveyed, after resorting to such extrinsic evidence as is admissible, that the deed will be held void for uncertainty in the description of the parcels. (footnotes omitted)

6 Thompson on Real Property, § 3021 pp. 444–45 (1962 Replacement). *Accord, Valdez Bank v. Von Gunther*, 3 Alaska 657, 660 (1909); *Garcia v. Garcia*, 86 N.M. 503, 525 P.2d 863, 865 (1974) (identity and quantity); *Birmingham v. McCoy*, 358 P.2d 824, 828 (Okl.1960) (quantity); *City and County of Honolulu v. Bennett*, 552 P.2d 1380, 1387 (Hawaii 1976) (quantity); *Bishop Homes, Inc. v. Devall*, 336 So.2d 313, 318–19 (La.App.1976); *Hamburg Realty Co. v. Woods*, 327 S.W.2d 138 (Mo.1959); *Tomity Corp. v. Sovkueff*, 244 Cal.App.2d 685, 53 Cal. Rptr. 328 (1966).

17. *See, e. g., Valdez Bank, supra* (subsequent acts); *Tomity Corp., supra* (subsequent conduct in boundary dispute); *Garcia, supra* (pointing out boundaries to surveyor who subsequently prepared plat relied on by parties); *Bishop Homes, Inc., supra* (plat).

cases, although at least one court has cautioned that "there must be sufficient information in the property description to base title substantially on written evidence and not principally on parol evidence."[18]

The Shellhouse deed described the location of the property with reference to the Hubbell plat. This plat was not available at trial. Nevertheless, the trial court was able logically to determine the configuration of the lots from the street references in the deed.[19] It also found that the Shellhouse property was situated between Corner No. 1 and Point No. 2 on Exh. B and consisted of approximately 400 feet of beachfront. This configuration and location is inconsistent with Shilts' statement that the property conveyed to Shellhouse extended 1,200 feet along the beach. The basis for the court's determination of location, as indicated in the memorandum decision, rested on testimony regarding Shellhouse's improvements. We note further that in this case the Shellhouse deed when read in conjunction with the missing Hubbell plat presumably would have contained a description of the property which would have identified the property with sufficient certainty. In such a case, a resort to extrinsic evidence is clearly valid.

Testimony at trial does indicate that Shellhouse occupied property between Corner No. 1 and Point No. 2 of Exh. B and made improvements thereon. This parol evidence along with the logical conclusions to be drawn from the street layout support Judge Schulz' findings regarding the configuration and location of the six lots. The trial court was able to test the credibility of witnesses and apparently disregarded Shilts' testimony in an effort to uphold the deed's validity.

While the extrinsic evidence is equivocal, we find that the property was adequately described at the time the conveyance was executed. It referred to a plat prepared by Chas. S. Hubbell. While that plat cannot be located, the description refers to six blocks, each 200 feet square and bounded by certain named streets. The streets apparently were depicted on the plat but either were never constructed, or in any event, no longer exist. The configuration found by the trial court logically conforms to the descriptions of the lots as set forth in the deed so as to contain the street boundaries indicated. The description also indicates that the land is within the eighty acres of U. S. S. 691. When extrinsic evidence is added to the effect that the Shellhouses had improvements on the land extending westerly along the beach frontage from Corner No. 1 of U. S. S. 691, the boundaries of the property may be delineated. The initial course would commence at Corner No. 1 of that survey and extend westerly along the meander line of mean high tide until that meander line intersects a north-south line parallel to the easterly boundary of that survey and 400 feet from that easterly boundary.[20] The rest of the description may be prepared in accordance with the configuration found by the trial court. The lots designated as 1 and 4 would be slightly larger or smaller than 200 feet square depending on the meander line. The property would, of course, be subject to the reservations set forth in the patent.[21]

We note further that the missing Hubbell plat was apparently relied upon for other deeds in U. S. S. 691. In keeping with the policy of giving effect to the intentions of the parties to deeds so as to make them

18. *Tinney v. Lauve*, 280 So.2d 588, 591 (La. App.1973).

19. *See* diagram page 5.

20. We note from the plat of U. S. S. 691 that 400 feet from Corner No. 1 extends beyond Point No. 2 referred to by Judge Schulz. We construe his reference to 400 feet of beach frontage, in accordance with the block sizes described in the deed, as controlling.

21. The patent contained a reservation for a sixty-foot right-of-way and some of the improvements extend into this right-of-way. In crude frontier communities, construction on rights-of-way could easily occur. In the event that the United States had sought to utilize that right-of-way, the improvements would have had to be removed or destroyed, but such considerations are irrelevant to the issues before us.

operative when possible, we believe that the trial court did not err in reconciling the description in the deed with the existing plat of U. S. S. 691 and with the testimony as to improvements on the land.

■ The trial court found, in effect, that William Shilts was the sole surviving heir of Aaron Shellhouse and succeeded to his interest in the six blocks. Unless his interest in that property has been extinguished by the adverse possession claim of Robert Young, Mr. Shilts would be entitled to prevail on his counterclaim seeking adjudication of title to that property.[22]

## THE ADVERSE POSSESSION CLAIMS

■ Mr. Young bases his claim on adverse possession under two statutes, AS 09.-10.030 [23] and AS 09.25.050.[24] The essential difference between the requirements for a claim under color of title and one without such color of title is in the number of years of possession required. In both cases, there must be uninterrupted, adverse and notorious possession, but only seven years is required under AS 09.25.050 as opposed to ten years under AS 09.10.030. The activities of Mr. Young occurred over a considerably longer period than ten years, so that the distinction between the statutes is immaterial. The question presented is whether the nature of his activities was such as to establish a right to the land in question by reason of adverse possession.

The property was of semi-wilderness nature, isolated and at a substantial distance from the nearest settlements. We have

extensively discussed the legal requirements for adverse possession under such circumstances in our recent opinions, *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826 (Alaska 1974), and *Alaska National Bank v. Linck*, 559 P.2d 1049 (Alaska 1977).

Our standard of review of the trial court's decision that Mr. Young's claim of adverse possession had been established will be that applied to legal conclusions. There are no material factual disputes as to the activities Mr. Young undertook with reference to the land. The dispute is as to the legal effect of those acts. As we stated in *Peters*:

In the present case, however, our decision depends primarily upon the validity or invalidity of the trial court's legal analysis, not its factual findings. The content of a particular legal doctrine, and what the facts of this case establish under such doctrine is the central issue in the case. Appellant Peters does not for the most part seek a reweighing of the evidence, but rather a reversal for failure to apply the proper standard of law. On questions of law, this court is not bound by the lower court's view, and consequently, we do not apply the "clearly erroneous" standard of review. 519 P.2d at 833–34.

The property involved in *Peters* was semi-wilderness, but more accessible than that of U. S. S. 691. The testimony indicated that Peters visited it every weekend. He lived on the property every year during seal hunting season and constructed a bench for scraping seal hides. He repaired boats

---

**22.** The court in its conclusions of law stated that William Shilts had not been seized or possessed of the property for a period of time in excess of ten years. "Seisin" has a variety of meanings in the law. Black's Law Dictionary p. 1524 (4th ed. 1951). We assume that the court was equating "seized" with physical possession of the land in view of the finding that the land described in the deed could be located. Having record title, Shilts was "seized" of the land in the title sense of the term. It is not necessary for a titleholder to be in physical possession of land for any period of time in order to assert his rights. AS 09.10.030 states in part that an action for recovery of real property may not be maintained unless the plaintiff or his predecessor was "seized or possessed of

the premises in question within 10 years before the commencement of the action." The statute uses the term "seized" in the sense of having legal title. *Williams v. Swango*, 365 Ill. 549, 7 N.E.2d 306, 309 (1937); *Carley v. Davis*, 452 P.2d 772, 776 (Okl.1969); *Beneficial Life Ins. Co. v. Wakamatsu*, 75 Idaho 232, 270 P.2d 830, 834 (1954). Shilts had such legal title, and in that sense, was "seized" of the land within ten years before asserting his counterclaim.

**23.** AS 09.10.030 is quoted in full at Note 9, *supra*.

**24.** AS 09.25.050 is quoted in full at Note 10, *supra*.

there and kept the beach free of rocks. He used the property as a base for hunting deer and smoking fish. He planted a garden and dug clams. Apart from these activities, there were several structures on the property indicating Peters' occupancy, and he had placed and maintained a bronze marker on one boundary and had the remains of a cabin on the other side. We stated:

> From the standpoint of the true owner, the purpose of the various requirements of adverse possession—that the nonpermissive use be actual, open, notorious, continuous, exclusive and hostile—is to put him on notice of the hostile nature of the possession so that he, the owner, may take steps to vindicate his rights by legal action. 519 P.2d at 832.

The judgment of the superior court denying Mr. Peters' adverse possession claim was reversed.

In *Alaska National Bank v. Linck, supra,* we upheld a finding that Mrs. Linck had adversely possessed an undeveloped parcel near the Richardson Highway about sixty miles southeast of Fairbanks. The record showed numerous acts of possession supporting Mrs. Linck's claim. Apparently, Mrs. Linck did not live on the land. However:

> Mrs. Linck's father planted a sizeable garden on the property for two years beginning in 1956 or 1957. She and her father erected in 1957 and maintained thereafter a barricade to prevent persons from crossing the property to gain access to a nearby Boy Scout camp. They posted a sign prohibiting hunting on the land. 559 P.2d at 1051.

Additionally, Mrs. Linck acted as owner of the property with respect to state and local officials—negotiating for easements, complaining about alleged trespasses and paying taxes. She granted an easement over the property resulting in clearing of the land and construction of a power line. Finally, she visited the property several times a year to inspect it and pick up litter.

In *Linck,* we discussed the three basic requirements for adverse possession:

> (1) The possession must have been continuous and uninterrupted; (2) the possessor must have acted as if he were the owner and not merely one acting with the permission of the owner; and (3) the possession must have been reasonably visible to the record owner. 559 P.2d at 1052–53.

It is with the third requirement that we have difficulty here. We explained this requirement in *Linck* as "notorious" possession so that if the owner visits the property, he would be put on notice and be able to assert his rights.

> The owner need not know about the presence of an adverse possessor, "[w]hat a duly alert owner would have known, the owner is charged with knowing." [25]

We stated that:

> [w]here possession is otherwise proven, courts generally recognize that community repute as well as physical visibility is relevant evidence that the true owner has been put on notice.
> (emphasis added) *Id.*

Here it is contended that Mr. Young was known in the community of Ketchikan as owner. It was indicated in *Linck,* however, that such repute, without evidence of possession on the land, is not alone sufficient.

We also stated in *Linck* that the character of the land must be considered with reference to the requirement of sufficient notoriety. The same acts are not required for uninhabited and forested land as for urban lots. Nevertheless, we referred to the fact that adverse possession must be such that the owner could see that a hostile flag was being flown over his property.

In *Linck,* we found such notoriety based in part on a garden that existed during part of the time in question; a barricade to keep people from crossing the property; an electric power line; land cleared for and an access road to maintain the line. Finally, it should have been evident that someone had been picking up litter from the property.

---

25. 559 P.2d at 1053.

In contrast, Mr. Young's activity gave no indication that a "hostile flag" was being flown over the property. Flying over property in an airplane gives no notice of possession. Being on the property at least once a year for a half or full day and walking the boundary lines hardly would give indication to the owner that there was a hostile claim. Yet testimony was limited to those acts on the property. Significantly, there was no clearing of land, construction of buildings or fences, placing of signs or any other physical evidence on the property indicating a hostile claim.

Assuming that Mr. Young regarded himself as owner and was the reputed owner in the Ketchikan area, had paid taxes in 1949 and 1950,[26] filed for and obtained water rights and filed a statement of real property ownership, those actions are not tantamount to indicating a hostile claim *on* the land. Even considering the wilderness condition of the property, some evidence of his claim on the land was necessary. Although we did regard payment of taxes as a critical factor in *Linck*, we did so only in connection with a visible physical presence on the land. Thus, we cannot find such payment determinative in this case. Here, no hostile flag was hoisted, and the adverse possession claim as to the six blocks must fail.

The case is remanded for entry of a judgment in favor of Mr. Shilts as to the six blocks conveyed to his predecessor in title.[27]

REVERSED AND REMANDED.

ERWIN, J., not participating.

---

**26.** His grandparents paid those state taxes.

**27.** We assume that counsel will have a suitable legal description prepared based on the trial court's findings and this opinion.